800 So.2d 435 (2001)
Todd REBSTOCK, et ux
v.
HOSPITAL SERVICE DISTRICT NO. 1, et al.
No. 01-CA-659.
Court of Appeal of Louisiana, Fifth Circuit.
November 27, 2001.
Rehearing Denied December 10, 2001.
*436 Kimberly A. Theriot, Jerald P. Block, Matthew F. Block, Law Offices of Jerald P. Block, Thibodaux, LA, Attorneys for Plaintiffs/Appellees.
Jacqueline G. Griffith, Charles J. Fulda IV, Griffith, Battard & Johnson, New Orleans, LA, Attorneys for Defendant/Appellant, the Louisiana Patients' Compensation Fund.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY, and CLARENCE E. McMANUS.
THOMAS F. DALEY, Judge.
This is an appeal by the Louisiana Patients' Compensation Fund from a jury verdict in favor of the plaintiffs.

FACTS
Twenty-eight-year-old Lisa Rebstock was involved in a serious automobile accident on April 13, 1993. At the time of the accident she was approximately 33 weeks pregnant. After being extricated from her car, she was transported by ambulance to St. Charles Parish Hospital, a hospital which did not have obstetrical services. Upon arrival to the hospital she was examined and treated by Dr. Helen Badie. Mrs. Rebstock remained at St. Charles Hospital for several hours during which time laboratory tests and x-rays were performed. The exact length of Mrs. Rebstock's stay at St. Charles Hospital was disputed by the parties. She was transferred to St. Ann Hospital in Raceland under the care of her obstetrician, Dr. Charles Faucheaux. An emergency Caesarean section was performed shortly after Mrs. Rebstock's arrival at St. Ann. During the procedure, it was discovered that Mrs. Rebstock had a condition known as abrupto placentae in which the placenta separates from the uterine wall causing a decrease in oxygen to the fetus. It was also discovered that Mrs. Rebstock had a ruptured uterus. The infant, Jake Rebstock, was lifeless at birth, but was resuscitated. He was transferred to Ochsner Hospital where he died two days later.
Mr. and Mrs. Rebstock filed a lawsuit for the wrongful death of their child against St. Charles Hospital and Dr. Badie alleging the defendants were negligent in their failure to properly diagnose Mrs. Rebstock's condition and failure to timely transfer Mrs. Rebstock to St. Ann Hospital. Following a four-day trial, the jury found in favor of the plaintiffs, awarding total damages of $613,810.00. After trial, the Louisiana Patients' Compensation Fund (the Fund) intervened in the suit stating that the defendants were both qualified health care providers under the Louisiana Medical Malpractice Act and as such the Fund is liable for judgments in excess of $100,000.00. Dr. Badie and the *437 hospital each paid the plaintiffs $100,000.00 plus interest, and received satisfaction of judgment and have not appealed. The Fund has appealed claiming the trial court erred in finding the defendants' breached the standard of care and in finding the breach caused the plaintiffs' damages. The Fund also argues the jury awards are an abuse of discretion.

DISCUSSION
In its first Assignment of Error, the Fund argues the facts and evidence show that Jake Rebstock died "as a result of a catastrophic event that occurred moments before Dr. Faucheaux saw Mrs. Rebstock at 4:50 p.m." The Fund contends there was no evidence presented that the care and treatment provided by Dr. Badie and St. Charles Hospital fell below the standard of care. While the Fund acknowledges that the tendering of $100,000.00 by each of the healthcare providers established liability, the Fund goes on to argue that the plaintiffs have the burden of proving the malpractice caused damages in excess of $100,000.00.
In Graham v. Willis-Knighton Medical Center, 97-188, p. 15 (La.9/9/97), 699 So.2d 365, 372, the Supreme Court explained the extent of plaintiff's burden of proving causation after an admission of liability is triggered by a $100,000.00 settlement. The court stated:
[T]he legislative intent of "liability" in Section 1299.44C(5) was that the payment of $100,000 in settlement establishes proof of liability for the malpractice and for damages of at least $100,000 resulting from the malpractice, which is a very significant benefit to the medical malpractice victim. However, at the trial against the Fund, the plaintiff has the burden of proving that the admitted malpractice caused damages in excess of $100,000.

Id. at 372.
On appeal the court may not set aside the factual findings made by the trier of fact in the absence of manifest error. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216. The manifest error rule applies in appeals of medical malpractice actions. Martin, v. East Jefferson Gen. Hosp., 582 So.2d 1272 (La.1991). Causation in medical malpractice cases is subject to the manifest error standard of review. Id. at 1274.
The crux of the Fund's argument is that the defendants have admitted liability for the failure to timely transfer Mrs. Rebstock, but the plaintiffs failed to prove that the failure to timely transfer Mrs. Rebstock caused the death of the infant. The Fund contends there was a catastrophic event that occurred just prior to the delivery of the infant which caused the death. We disagree.
Dr. Gary Harris was accepted by the court as an expert in the field of emergency medicine. Dr. Harris testified that given the fact that Mrs. Rebstock was in a very serious accident and was 33 weeks pregnant her uterus and fetus were the "main things at risk" for injury as they are the first things to hit the steering wheel. He explained that the uterus is a stretchable, pliable muscle while the placenta is stiff and not pliable. When these areas are struck by something outside the mother's body, the placenta separates from the uterine wall. This results in decreased blood flow and decreased oxygen to the fetus. Dr. Harris explained that upon admission to St. Charles Hospital the fetal heart rate was recorded as 160s. The heart rate was recorded as 160s one other time before Mrs. Rebstock was transferred. Dr. Harris testified that a fetal heart rate in the 160s is the very upper limit of normal and was an indication that *438 the fetus was in distress. He explained that there was decreased oxygen being delivered to the fetus, so the fetus responded by increasing its heart rate. Dr. Harris further testified that the fact that the medical records indicate that Mrs. Rebstock complained of abdominal pain at St. Charles Hospital was a "red flag" that something was "going on in her belly." He further testified that there was no indication in the medical records that Dr. Badie even considered that Mrs. Rebstock had a placental abruption.
Dr. Harris testified that when a pregnant patient presents to an emergency room in a hospital without obstetrical capabilities, the standard of care in emergency medicine requires that the patient be transferred. He explained that Dr. Badie and the personnel at St. Charles Hospital should have been able to fully evaluate Mrs. Rebstock in 20 minutes, then transfer her. He criticized the fact that the medical records indicated that the blood was not drawn for laboratory tests until an hour and twenty minutes after Mrs. Rebstock's arrival. He explained that the results of Mrs. Rebstock's blood tests indicated that there was ongoing bleeding in her body. Dr. Harris testified that even if we were to accept Dr. Badie's testimony that it took one and a half hours to complete the evaluation of Mrs. Rebstock including x-rays and laboratory tests, the latest Mrs. Rebstock should have been transferred was 2:30 p.m. The medical records are unclear as to the actual time of transfer. The last notation on the St. Charles Parish Hospital is 3:43 p.m., while the first notation on the St. Ann's hospital record is 4:45 p.m. The ambulance report states that the two hospitals were 20 miles apart.
Dr. Badie testified that when she called Dr. Faucheaux, Mrs. Rebstock's obstetrician, to transfer Mrs. Rebstock, Dr. Faucheaux requested that Mrs. Rebstock be evaluated by a surgeon for possible splenic rupture. The medical records indicate that Dr. Badie spoke to Dr. Faucheaux at 2:30 p.m. and that a surgeon was paged at 3:00 p.m. After being paged a second time, the surgeon called the emergency room and stated he was in Baton Rouge. Dr. Badie then decided to transfer Mrs. Rebstock without the surgical evaluation. Dr. Harris testified that it was below the standard of care for Dr. Badie to page the surgeon and wait because an emergency room physician is trained to evaluate a patient for bleeding in the abdomen.
Dr. Harris concluded that Mrs. Rebstock had a progressive placental abruption and that if the baby had been delivered at 3:43 p.m. or earlier the baby would have been born alive and breathing.
Dr. Faucheaux testified that when he was called by Dr. Badie he was informed that Mrs. Rebstock had abdominal pain and contractions. Based on his later physical examination, he diagnosed Mrs. Rebstock as having a ruptured uterus and an abrupted placenta. Dr. Faucheaux concluded both of these conditions were caused by the accident and progressed with time. Dr. Faucheaux testified that this is a common injury caused by hitting the steering wheel. Further, Dr. Faucheaux testified that he did not recall requesting a surgeon be consulted; rather, he just asked Dr. Badie to fully evaluate the abdomen before the transfer. He concluded that the baby died of anoxia secondary to the placental abruption.
We find that the testimony of Drs. Harris and Faucheaux supports the jury's finding that the failure of defendants to diagnose the abruption and timely transfer Mrs. Rebstock caused the death of the baby.
*439 In its Second Assignment of Error, the Fund argues the jury abused its discretion by awarding Lisa Rebstock $366,250.00 and Todd Rebstock $237,800.00 for the loss of their two-day old child. The Medical Malpractice Act provides a $500,000.00 limit on general damages recoverable by malpractice victims, therefore, our review of the quantum in this case is limited to a total award of $500,000.00. The Fund cites various cases in which parents were awarded lower amounts for the loss of an infant and urges this Court to reduce the awards. Plaintiffs cite two cases involving the death of an infant in which similar awards were affirmed on appeal. In Landry v. Clement, 97-852 (La.App. 3 Cir. 4/15/98), 711 So.2d 829, the court affirmed an award of $450,000.00 in general damages to the parents of a stillborn infant. An award of $500,000.00 to parents of an infant who died 24 hours after birth was affirmed in McCann v. ABC Insurance Company, 93-1789 (La.App. 4 Cir. 7/14/94), 640 So.2d 865.
In Andrus v. State Farm Mutual Auto. Ins. Co., 95-0801 (La.3/22/96), 670 So.2d 1206, 1210, the Supreme Court explained the standards governing appellate review of general damage awards stating:
Because discretion vested in the trial court is `great,' and even vast, an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damage in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. (Citation omitted)
Reviewing the particular facts of the case at bar, we conclude that a reasonable trier of fact could have awarded damages in the amounts awarded to the Rebstocks. The testimony elicited at trial established that the Rebstocks had been married for 13 years at the time Mrs. Rebstock became pregnant with the baby. They had one eleven-year-old daughter. Mrs. Rebstock testified that she was scared at the process of starting all over with a baby, but after she started "getting baby things" she became excited. She stated that her husband and daughter were ecstatic over the pregnancy.
Mrs. Rebstock testified that she felt pain in her stomach at St. Charles Hospital and felt that something was wrong. She kept asking Dr. Badie and the nurse caring for her when she would be transferred. Mrs. Rebstock testified that she was told she was going to St. Ann Hospital and she was overreacting. Mrs. Rebstock described the events that took place when she arrived at St. Ann. She testified that when she saw Dr. Faucheaux's face, she knew the baby was dying. She was taken to the delivery room and placed under general anesthesia. She woke up in the Intensive Care Unit (ICU) and was told that the baby had been taken to Ochsner and was in critical condition. Her family described her baby, Jake, as a beautiful baby with a full head of hair. The day after Jake's birth, the staff at St. Ann's told her Ochsner had called stating they needed to do a procedure because Jake was having seizures. She told them her husband and daughter were on the way to Ochsner. She continued to ask the staff at St. Ann about Jake's condition and they told her not to worry. She testified that she knew he had died and she recalled her husband coming in to tell her Jake had died.
*440 Mrs. Rebstock testified that the funeral was held the next day and that she was unable to attend because she was still in ICU. She explained that everyone saw Jake, but her and she became very depressed. She was admitted to DePaul Hospital for treatment of depression. The therapists suggested that she hold a memorial service for Jake on what would have been his first birthday. She testified that she wrote a note to Jake and attached it to a helium balloon that she released in the sky. Mrs. Rebstock testified that she was trying to work through her depression, but there were times when she did not want to live.
Todd Rebstock testified that he and his wife did not plan this pregnancy, but were very excited about it. He explained that on his birthday an ultrasound was performed, which showed they were having a boy whom they named Jake. Mr. Rebstock was thrilled because this would be the first boy in the Rebstock family and now there would be someone to carry on the Rebstock name.
Mr. Rebstock testified that he arrived at St. Ann Hospital when Mrs. Rebstock was in surgery. Dr. Faucheaux told him the baby was critical. He saw Jake in the incubator as he was being transferred to Ochsner. He called Ochsner several times that night to check on Jake. Mr. Rebstock explained that he related Jake's condition to his wife who was very upset. The next day when he arrived at Ochsner, he was told the baby would not survive. Mr. Rebstock stated that his wife did not attend Jake's funeral and never saw Jake. He testified regarding Mrs. Rebstock's treatment for depression and explained that she had not been the same since Jake's death.
Considering the effect that the death of their son had on the Rebstocks, we cannot say that the jury abused its vast discretion in awarding general damages.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.