LSUSAN M. CHEHARDY, Judge.
In this medical malpractice action, after trial, the jury found that the doctor did not *1092 breach the applicable standard of care in his medical treatment of plaintiffs’ son, Benjamin Ricks. For the following reasons, we affirm.

Facts

On July 20, 1991, Benjamin Ricks, a healthy 16-year-old boy, suffered a gunshot wound to his left chest. He was admitted to East Jefferson General Hospital(“EJGH”), where Dr. Stephan Harkness, a general surgeon, performed emergency surgery to repair damage caused by the bullet to Benjamin’s stomach and pancreas. Benjamin tolerated the surgery well.
When Benjamin was admitted, numerous tests were performed, including a toxicology screen. Because Benjamin’s toxicology screen was positive for alcohol and valium, Dr. Harkness recommended, and Benjamin’s parents agreed, that, for the remainder of his in-patient stay, Benjamin should be housed in the Chemical Dependency Unit(“CDU”) at EJGH. On August 7, 1991, Benjamin’s parents removed him from CDU against medical advice.
On August 9, 1991, Benjamin had been complaining of nausea for about 24 hours and experiencing vomiting for about eight hours. When his mother took him to Dr. Harkness’ office for a regularly scheduled post-operative examination, Dr. | ¡¡Harkness prescribed medication to help alleviate the nausea and vomiting. At that point, the nausea and vomiting were considered to be symptoms of viral gastritis because another family member had recently experienced a similar “stomach bug.” During the office visit, Dr. Harkness advised Janice Ricks that he was going out of town and, if Benjamin’s condition worsened, she should call Dr. Ruary O’Connell, who was covering for him while he was away, and take Benjamin to the emergency room at EJGH.
That evening around 6:00 pm, Hugh Ricks called Dr. O’Connell to report that Benjamin was not tolerating the medication prescribed by Dr. Harkness and his condition had worsened. Dr. O’Connell advised the Ricks to take Benjamin to the emergency room at EJGH. Dr. O’Connell, who had previously spoken with Dr. Harkness, was aware that Dr. Harkness had seen Benjamin that morning for a routine post-surgical visit and that Benjamin had complained of nausea, which Dr. Harkness believed was attributable to a virus.
Dr. O’Connell telephoned the emergency room, ordered specific lab tests for Benjamin, asked the surgical resident on duty, Dr. Sobiesk, to evaluate Benjamin and call him back when the test results were ready. Dr. O’Connell also asked for a copy of the hospital record for Benjamin’s previous admission. At about 7:10 pm, Benjamin arrived at the emergency room. The lab tests that Dr. O’Connell ordered were performed. Throughout this time, Benjamin continued to vomit so Dr. Sobiesk ordered intravenous fluids for Benjamin to prevent further dehydration.
At about 9:45 pm, Dr. O’Connell arrived at the emergency room. After reviewing the test results and the hospital record from Benjamin’s previous admission, Dr. O’Connell found that the results were within normal limits except that Benjamin had a temperature of 99°, which is not unusual for a post-operative patient, and a mildly elevated white blood count, which is not uncommon for a person with a “stomach bug.” In fact, Benjamin’s blood tests indicated that the measure of his red blood cells, or hematocrit, was 41.9, which was 6 points higher than the last |4hematocrit level recorded during his previous hospital admission. Further, when Dr. O’Connell and Dr. Sobiesk physically examined the patient, their examination did not reveal any abnormalities. Benjamin, however, *1093 had not responded to the medication prescribed by Dr. Harkness and he needed intravenous fluids to counteract dehydration so Dr. O’Connell recommended to the Ricks that they admit Benjamin to the hospital for overnight observation. Dr. O’Connell left the hospital shortly after this discussion.
At 12:05 a.m. on August 10, 1991, Benjamin was moved to the Pediatric Unit. Although Benjamin continued to complain of pain, he was not given any pain medication. At about 2:30 a.m., Benjamin was given a shot of Tigan for nausea, which he tolerated well.
At 2:40 a.m., Benjamin, who had been sitting up in bed, exclaimed, “We need a doctor now. My stomach is burning.” He then had involuntary spasms throughout his entire body, fell back across the bed, hit his head on the cart, and accidentally removed his IV line. At that time, he had no pulse, no respirations, no detectable blood pressure, and was unresponsive to stimuli. The charge nurse called a Code III in Benjamin’s room.
Five nurses and a respiratory technician immediately responded to the code and administered cardiopulmonary resuscitation. At that point, the hospital record indicates, “Patient ashen, lips blue, diapho-retic, urine noted on floor.” At 2:45 a.m., after performing CPR, the nurses detected a heart rate of 67 beats per minute and normal sinus rhythm so chest compressions were stopped. Benjamin was not, however, breathing on his own so the respiratory technician continued to introduce air into his lungs with a bag and mask ventilator.
At 2:49 a.m., a nurse anesthetist intubat-ed Benjamin to allow more efficient ventilation with an ambu bag. At 2:50 a.m., Dr. Guevara, who was the Chief of Emergency Medicine at EJGH, and Dr. Sobiesk entered Benjamin’s room. At 2:55 a.m., one of the nurses called Benjamin’s family as well as Dr. O’Connell, who told |RPr. So-biesk to order a complete blood count, blood chemistry profile, toxicology screen, and amylase test.
At 3:00 a.m., after several attempts by both Dr. Sobiesk and Dr. Guevara, Dr. Sobiesk successfully placed a central line in the right subclavian vein and an IV in the right external jugular vein for rapid infusion of resuscitative fluids. At 3:01 a.m., the first liter of lactated ringers was introduced. At 3:04 a.m., per Dr. O’Con-nell’s telephone orders to Dr. Sobiesk, Benjamin was given a mid-level dose of Narcan to counter the effects of any opiates in his system. At 3:10 a.m., a Dopamine drip was started. At 3:15 a.m., sodium bicarbonate was administered to counteract the effects of metabolic acidosis.
At 3:23 a.m., the nurses were able to record a blood pressure for Benjamin for the first time since the code was called. Benjamin’s blood pressure at that point was 80 over Doppler, indicating that the machine used to record blood pressure could not detect a diastolic blood pressure.
At 3:32 a.m., Dr. O’Connell arrived, received a situation report from Dr. Sobiesk and a nurse, examined Benjamin and then spoke with his family. Dr. O’Connell reviewed the results of the lab tests that he had ordered over the telephone. Because the results of the original tests, particularly the hematocrit level of 33, were inconsistent with the seriousness of the patient’s condition, Dr. O’Connell ordered another complete blood count performed immediately.
At 3:50 a.m., per Dr,. O’Connell’s orders, Benjamin was transferred to the Intensive Care Unit where he could be monitored more closely. Dr. O’Connell requested a consult by Dr. Snyder, an invasive cardiol *1094 ogist, who inserted a Swan-Ganz catheter to measure volume of the cardiopulmonary system. Dr. Sobiesk inserted a chest tube to alleviate a pneumothorax that had developed in Benjamin’s right chest.
At about 4:30 a.m., Dr. O’Connell received the results from the repeat complete blood count, which indicated a hemat-ocrit of 18.5. Dr. O’Connell immediately I Rperformed a needle tap of Benjamin’s abdomen, which revealed blood in his abdomen. Believing that Benjamin had suffered a ruptured aortic aneurysm, Dr. O’Connell ordered emergency surgery as well as immediate infusion of fluids and transfusion of blood for Benjamin. He obtained consent for the surgery from Benjamin’s parents. By 5:15 a.m., the anesthesiologist was preparing Benjamin for surgery. At that point, Benjamin was receiving massive amounts of blood products and fluids, but his blood pressure remained at 70 over Doppler.
Dr. O’Connell, assisted by Dr. Todd Englehardt, a eardiothoracic surgeon, as well as Dr. Sobiesk, began surgery at 5:30 a.m. Dr. O’Connell discovered and repaired the disruption in Benjamin’s splenic artery. During surgery, the anesthesiologist administered calcium chloride to promote coagulation, sodium bicarbonate to counteract acidosis, and Dopamine and Neosynephrine to elevate the patient’s blood pressure. To combat the effects of hypothermia evident in a patient with substantial blood loss, Dr. O’Connell ordered a K thermia blanket set at 100° F placed under Benjamin during surgery. Further, as is hospital practice, the doctors used warm saline for irrigation, and warm air in the ventilator during surgery. In addition, the ambient temperature of the operating room was raised. Despite the medical team’s efforts, however, Benjamin Ricks died at 11:20 a.m. on August 10, 1991.

Procedural History

In August of 1992, Hugh and Janice Ricks filed a complaint for damages with the Louisiana Patient’s Compensation Fund alleging that the negligence of Dr. O’Connell and EJGH caused their son’s death. On August 29, 1994, a medical review panel, which consisted of three independent physicians, unanimously concluded that Dr. O’Connell acted within the applicable standard of care in his treatment of Benjamin Ricks.
On October 27, 1994, Hugh and Janice Ricks filed this action against Dr. O’Con-nell and EJGH. On January 28, 2002, the matter went to trial. After five days |7of testimony, the twelve-member jury unanimously found that Dr. O’Connell did not breach the applicable standard of care in his medical treatment of Benjamin Ricks.[1] The jury’s verdict was made the judgment of the Court.
On February 28, 2002, plaintiffs filed a motion for judgment notwithstanding the verdict or, alternatively, motion for new trial. After a hearing on May 13, 2002, the trial judge denied both motions finding that “the Jury had a totality of evidence that they could have arrived at the decision that under the circumstance the Doctor acted prudently, or at least not in such a fashion to have reached a degree of negligence to find him guilty of malpractice.” The judgment was signed on May 20, 2002. Plaintiffs thereafter filed a timely motion for appeal.

Analysis

In their appellate brief, plaintiffs have asserted two assignments of error: the jury clearly erred when it failed to find *1095 that Dr. O’Connell’s treatment of Benjamin Ricks for a drug overdose, long after the drug toxicology test he initially ordered came back negative, was a breach of the standard of care; and the trial court erred in denying the Plaintiffs’ Motion for Judgment Notwithstanding the Verdict or, Alternatively, Motion for New Trial when it failed to find that any reasonable juror should have found that Dr. O’Connell’s treatment of Benjamin Ricks for a drug overdose, after the drug test he ordered came back negative, was a breach of the standard of care.
The plaintiffs’ sole argument before this Court is that Dr. O’Connell breached the applicable standard of care for a surgeon by prescribing the anti-opiate drug, Nar-can, for his patient with a positive toxicology screen in his recent history when this patient suddenly experienced loss of vital signs, or “coded,” while he was in the hospital.
In Pfiffner v. Correa, 94-0924 (La.10/17/94); 643 So.2d 1228, the Louisiana Supreme Court reiterated the following:
| ¡Medical malpractice has been defined by La. R.S. 40:1299.41(A)(8) as: any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient.
La. R.S. 9:2794 sets forth the burden of proof imposed upon the plaintiff in establishing his malpractice claim. The plaintiff must prove by a preponderance of the evidence:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Thus, the plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician’s alleged negligence and the plaintiffs injuries resulting therefrom.
[[Image here]]
... [Ejxpert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plain *1096 tiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794’s requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician’s conduct as well as any expert can, or in which the defendant/physician testifies as to |9the standard of care and there is objective evidence, including the testimony of the defendant/physician, which demonstrates a breach thereof. Even so, the plaintiff must also demonstrate by a preponderance of the evidence a causal nexus between the defendant’s fault and the injury alleged.
Pfiffner, 643 So.2d at 1233-1234. Further, the appellate court may not set aside the factual findings made by the trier of fact in the absence of manifest error. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216. The manifest error rule applies in appeals of medical malpractice actions. Rebstock v. Hospital Service Dist. No. 1, 01-659 (La.App. 5th Cir.11/27/01), 800 So.2d 435, 437.
In this case, as in Pfiffner, supra, the alleged negligence is not like a physician’s leaving a sponge in a patient’s body or his amputation of the wrong leg; plaintiffs here claim that their son’s death was caused by treating him for a drug overdose in the face of a negative drug screen. Surely, there are cases in which treatment for a condition that is not present would constitute medical malpractice and where causation is evident. Further, there are no doubt other instances in which the medical and factual issues are within the lay person’s ability to perceive as negligence and harmful through treatment for a condition which is not present.
The causal connection, however, between a patient’s death and administration of potentially life-saving medications after that patient has coded involve complex medical conditions, which are simply beyond the province of lay persons to assess. Plaintiffs here needed to establish, either through their own expert or the testimony of the defendant or defense experts, that given their son’s medical history and condition, as well as the defendants’ clinical and diagnostic findings, that Dr. O’Connell breached a specified standard of care (perhaps that, under these circumstances, treatment for a possible drug overdose was unwarranted) and that this breach caused Benjamin’s death or loss of a chance of survival. In the absence of such testimony, and even assuming all other facts favorable to the plaintiffs, the jury’s finding must be |inaffirmed because there is no proof that Benjamin would have fared any better if he had not been treated with Narcan. In fact, the evidence is to the contrary.
Two medical experts, Dr. Gary Danos and Dr. Carol Foti, testified that treatment for a drug overdose with Narcan in the extant situation was reasonable until the diagnosis of hemorrhagic shock was confirmed at 4:30 a.m. Further, Dr. O’Con-nell testified that Narcan has no effect on a patient who has not ingested opiates. Moreover, Benjamin’s hematocrit level immediately after he coded was 33.3, which as Dr. O’Connell testified, persuaded him to consider other metabolic causes, including heart attack or drug overdose, more than hemorrhagic shock in his differential diagnosis. Finally, all three defense experts testified that a ruptured aneurysm in the splenic artery is extremely rare and the chance of survival once suffered was no greater than 5%. Here, the plaintiffs did not meet their burden of establishing that the alleged unreasonable treatment with Narcan contributed, in whole or part, to *1097 their son’s death or loss of a chance of survival.
We find that the record contains ample probative facts to support the jury’s conclusions in this case. Because we find that the jury was reasonable in finding that Dr. O’Connell did not breach the applicable standard of care in his treatment of Benjamin Ricks, we pretermit discussion of causation. Accordingly, we find plaintiffs’ first assignment of error is without merit.
Finally, in their last assignment of error, the plaintiffs argue that the trial judge erred in not granting their Motion for Judgment Notwithstanding the Verdict or, Alternatively, Motion for New Trial. JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men Inin the exercise of impartial judgment might reach different conclusions, the motion should be denied. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991).
Refusal to render a judgment notwithstanding the verdict (JNOV) can only be overturned if it is manifestly erroneous. Delaney v. Whitney National Bank, 96-2144, 97-0254 (La.App. 4 Cir. 11/12/97), 703 So.2d 709, writ denied, 98-0123 (La.3/20/98), 715 So.2d 1211. Furthermore, a jury’s finding of fact may not be reversed absent manifest error or unless clearly wrong. Stobart v. State of Louisiana, Through Department of Transportation and Development, 92-1328 (La.4/12/93), 617 So.2d 880. The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court’s findings; it must instead review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882.
The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfin-der’s conclusion was a reasonable one. Stobart, supra. The reviewing court must always keep in mind that “if the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Stobart at 882-83. (Citations omitted).
In this case, we have already concluded that the jury’s finding was not clearly wrong. Although we understand that the plaintiffs suffered a great loss, we cannot say, viewing the record in its entirety, that the jury’s conclusion was unreasonable. Therefore, we cannot say that the trial court’s refusal to grant the plaintiffs motion for judgment notwithstanding the verdict was manifestly erroneous.
Finally, granting or denying a motion for new trial rests within the wide discretion of the trial court and its determination shall not be disturbed absent an abuse of that discretion. Lambert v. State Through Dept. of Transp. & Development, 96-160 (La.App. 5 Cir. 10/16/96), 683 So.2d 839, 845. We find no abuse in the trial court’s denial of plaintiffs’ motion for new trial. Accordingly, we find that plaintiffs’ second assignment of error also lacks merit.
*1098 In conclusion, we affirm the jury verdict and the trial court’s denials of the Judgment Notwithstanding the Verdict and, alternatively, Motion for New Trial. Costs for this appeal are to be paid by the plaintiffs.

AFFIRMED.

. After the plaintiffs rested their case during trial, counsel for EJGH moved for an involuntary dismissal pursuant to La. C.C.P. art. 1672(B), which the trial judge granted.