I,SOL GOTHARD, Judge.
Plaintiffs, Anthony Sumter and Brenda Sumter, individually and on behalf of their deceased minor, Tranae Sumter, appeal from a decision of the trial court in favor of defendant, Louisiana Patient’s Compensation Fund, dismissing their suit for medical malpractice. For the reasons that follow, we affirm the decision of the trial court.
Plaintiffs instituted these proceeding by filing a petition against West Jefferson General Hospital with the Louisiana Patient’s Compensation Fund. A medical review panel was convened, and the review panel found no merit to plaintiffs claims. Thereafter, plaintiffs filed the instant suit. After settlement with West Jefferson General Hospital, plaintiffs proceeded against the Louisiana Patient’s Compensation Fund. By agreement of the parties, the issues of liability and damages were bifur *1181 cated for trial. After trial on the issue of liability, the court found for defendants and dismissed plaintiffs’ case. This appeal followed.
Tranae Sumter was born on February 25, 1996, shortly after midnight. Her birth was uneventful. She was healthy, with APGAR scores of 9 immediately after birth and five minutes after birth. She was placed in the healthy newborn nursery, |swhere she received routine care. Pursuant to hospital policy, she was placed on her stomach for sleep. The first 28 hours of life passed uneventfully. At 4:00 a.m. on February 26, 1996, it was noted that the child was sleeping quietly, with a “relaxed and easy” breathing. At 4:40 a.m., the child was found to be dusky and not breathing. She was resuscitated, however; she was left with brain damage and cerebral palsy. This was termed an “Acute Life Threatening Event” (ALTE). The child died on October 31,1997.
There was no identified cause for the ALTE. Both the mother and the infant at birth had a fever, and therefore antibiotics were administered to treat possible infection. Cultures performed on the infant were negative. The autopsy performed on the child did not reveal the cause of the ALTE one year and eight months previous.
In their petition, plaintiffs allege that West Jefferson Hospital’s policy of positioning neonates prone while in the nursery was a violation of the applicable standard of care and the cause of the injuries suffered by the child. After trial, the court found that plaintiffs had failed to prove their ease by a preponderance of the evidence. In his judgment, the trial judge stated that:
Plaintiffs failed to prove that West Jefferson Medical Center’s policy of placing neonates on their stomach in February of 1996 was below the applicable standard of care. Additionally, the evidence adduced at' trial failed to establish that the placing of the baby on her stomach caused the acute life threatening event.
Plaintiffs in a medical malpractice suit against a hospital have the burden of showing that the hospital personnel negligently departed from the recognized standard of care afforded by hospitals in the area for the particular malady involved. Dean v. Ochsner Medical Foundation Hosp. and Clinic, 99-466 (La.App. 5 Cir. 11/10/99), 749 So.2d 36. A plaintiff must show a standard of care, a breach of that standard, an injury and a causal relationship between the injury and the breach of that duty. Boutte v. Jefferson Parish Hosp. Service Dist. No. 1, 01—918 (La.App. 5 Cir. 1/15/02), 807 So.2d 895, writ denied 2002-0498, (La.4/19/02), 813 So.2d 1093.
The appellate court may not set aside the factual findings made by the trier of fact in the absence of manifest error. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216. The manifest error rule applies in appeals of medical malpractice actions. Rebstock v. Hospital Service Dist. No. 1, 01-659 (La.App. 5th Cir.11/27/01), 800 So.2d 435, writ denied 2002-0077 (La.3/15/02), 811 So.2d 914. Causation in medical malpractice cases is subject to the manifest error standard of review. Rebstock, supra.
The testimony at trial established the following. In the late 1980’s, the medical community began to investigate the possibility that there was a link between Sudden Infant Death Syndrome (SIDS) and placing an infant in a prone position for *1182 sleeping. In 1991, a task force was empaneled to investigate. In 1992, the American Association of Pediatrics published the results of the task force, which recommended placing the infant in a supine or side position. In 1994, the “Back to Sleep” campaign began. This campaign led to a major decrease in SIDS rate. Although the study focused on the age range of two to six months, which are the “high risk” ages, the campaign recommended that hospitals place the neonates on their stomachs. (A neonate is an infant from birth to thirty days. A newborn is after thirty days.) The purpose of the recommendation was to train the mother and child prior to the two to four month range where SIDS is most prevalent.
The plaintiff asserted that the positioning of the neonate in this case caused her to suffer the ALTE: At trial the plaintiffs presented the testimony of Dr. David Go-zal, an expert in pediatrics and pediatric pulmonology. He opined that the likelihood of the infant suffering this event was increased ten-fold because of her placement in the prone position, and that it was a greater than fifty-percent chance |Rthat the event would have been avoided had she been placed in the supine position. He stated that the standard of care in 1996 was to place neonates on their backs, and that seventy-six percent of the hospitals in the country were placing infants in a supine position. At that time, the American Journal of Pediatrics recommended that an infant be placed in a supine position; however, the Journal does state that it does not set the standard of care.
Dr. Gozal acknowledged that the child at issue suffered an ALTE, and not SIDS. On cross-examination, he admitted that the neonate statistics had not been studied, and that there was no scientific evidence to support his opinion that there was a relationship between positioning a neonate and the rate of SIDS. He further admitted he could not make a scientific statement linking positioning and ALTE.
Defendant presented the testimony of Dr. John Kattwinkel, certified in pediatrics and neonatal and perinatal medicine, and an expert in SIDS. In 1991, he was appointed chairman of the SIDS taskforce. He stated that the taskforce was put together to evaluate claims made by foreign countries concerning sleep positions and SIDS. These studies were conducted on the two to six month age range. In 1992, they recommended that infants be placed in a supine position. At that time, 70-80% were placed being placed on their stomachs. The consensus was that the best way to educate new mothers was on first contact, or in the nursery, and so the child would get used to the position, and therefore, the campaign included hospital nurseries with the hopes that the mother would continue at home. The campaign met with strong opposition, much of which was documented. In 1998, one fifth of all infants were still being placed on their stomachs.
Dr. Kattwinkel stated that he knew of no studies linking ALTE with positioning.
Dr. Kattwinkel testified that, in his opinion, there was no relationship between the life-threatening event and the positioning of the baby. He stated that it |fiwas not a violation of the standard of care for a hospital to place an infant in a prone position in early 1996.
Dr. Judy Riley, pediatrician, was on the medical review panel that considered plaintiffs’ claim. The panel found that the nursing care was appropriate and that there was no uniform standard of care concerning infant positioning in the United *1183 States in February of 1996. Thus the panel concluded that the hóspital did not deviate from the standard of care. Dr. Harley Ginsberg, neonatologist, who also was on medical review panel, stated at trial that he was still of the opinion that the hospital did not deviate from the standard of care.
After a review of the record as a whole, we cannot say that the trial court erred in finding that plaintiffs failed to prove that the actions of the hospital caused the infant to suffer the Acute Life Threatening Event, and that the hospital did not deviate from the standard of care in 1996 by placing the newborn in a prone position.
Plaintiffs contend that the doctrine of res ipsa loquitur should be applied to this case. The doctrine of res ipsa loquitur applies when: (1) the accident would not normally occur in the absence of negligence, (2) there is an absence of direct evidence to explain the activities leading to the injury, and (3) the accident or injury was caused by an agency on instrumentality within the actual or constructive control of the defendant. “Res ipsa loqui-tur applies when ‘circumstances suggest the defendant’s negligence as the most plausible explanation for the injury.’ ” Thus, plaintiffs must show that the injury would not normally occur in the absence of negligence. Dean v. Ochsner Medical Foundation Hosp. And Clinic, supra at 39-40.
Here, Dr. Kattwinkel testified that there were many reasons, some still unidentified, which could cause an infant to suffer either a SIDS or an ALTE. Furthermore, Dr. Kattwinkel stated that a possible explanation, in addition to |7others, for the ALTE could be an infection, as both the mother and the neonate had a fever. The doctrine of res ipsa loquitur is inapplicable here.
For the above-discussed reasons, the judgment of the trial court is affirmed. All costs are assessed against appellants.

AFFIRMED.