922 So.2d 1248 (2006)
Annette C. LeBLANC, Dr. Roland A. LeBlanc, Jr., Jason LeBlanc and Jeanelle M. Stein
v.
Dr. John J. WALSH, Jr. and Hospital Service District No. 2 for the Parish of Jefferson d/b/a East Jefferson General Hospital.
No. 05-CA-528.
Court of Appeal of Louisiana, Fifth Circuit.
February 14, 2006.
*1250 Arthur J. Lentini, Metairie, LA, for Plaintiff/Appellee.
Corinne A. Morrison, Douglas L. Grundmeyer, Jonathan C. McCall, R. Harold McCard, Jr., Chaffe McCall, New Orleans, LA, for Defendant/Appellee-3rd Appellant.
Richard L. Weil, Gerald F. Arceneaux, Guste, Barnett & Shushan, New Orleans, LA, for Defendant/Appellee-2nd Appellant.
Jacqueline H. Blankenship, Metairie, LA, for Defendant/Appellant.
Panel composed of Judges CLARENCE E. McMANUS, WALTER J. ROTHSCHILD, and SAM A. LeBLANC, III, Pro Tempore.
CLARENCE E. McMANUS, Judge.
Defendants, Dr. John J. Walsh, Jr. ("Dr. Walsh"), Hospital Service District No. 2 d/b/a East Jefferson General Hospital ("EJGH"), and the Louisiana Patients' Compensation Fund appeal the trial court's judgment in favor of plaintiffs, Annette C. LeBlanc, Dr. Ronald A. LeBlanc, Jr., Jeanelle M. Stein, and Jason LeBlanc, in this medical malpractice action resulting from the treatment of Ronald LeBlanc, Sr. ("LeBlanc") by defendants. For the reasons which follow, we affirm the trial court's judgment in favor of the plaintiffs and affirm the trial court's damage awards to those plaintiffs.

STATEMENT OF THE CASE
In December 1999, Ronald LeBlanc, Sr. sought medical treatment from Dr. Walsh, who worked at East Jefferson General Hospital. Dr. Walsh performed an examination and confirmed that LeBlanc had a hernia and they discussed surgical options. Dr. Walsh performed an initial exam, noting no history of cardiopulmonary disease and no symptoms of significant heart or lung disease. LeBlanc reported to Dr. Walsh a previous liver surgery for a gunshot wound and ankle surgery from a fall while roller skating. LeBlanc also reported a previous allergic reaction to Keflex and told Dr. Walsh that he smoked a pack and a half of cigarettes a day and drank a six pack of beer per day.
As part of the initial work-up, a chest x-ray, metabolic work-up, and electrocardiogram were ordered. The metabolic workup and electrocardiogram were within the normal range. The chest x-ray was taken on December 10, 1999 and it revealed an abnormality. The radiologist suggested a CT scan of LeBlanc's chest, which was then ordered by Dr. Walsh. The CT scan of the chest was performed on December 20, 1999. The radiologist reported that the abnormality was probably an old scar in the lungs. It was noted that it would be ok to proceed to surgery, but the radiologist *1251 recommended getting the chest x-ray taken years prior to this scan. Dr. Walsh then spoke to LeBlanc's son, Dr. Ronald LeBlanc, Jr., to discuss his choice for a pulmonologist to evaluate his father's viability for surgery based on the spot on the lung that appeared on the chest x-ray and CT scan. Dr. Matthew Schuette examined and evaluated LeBlanc. He confirmed that LeBlanc had chronic obstructive pulmonary disease, but only had a reasonable risk for surgery without significant increase of risk for cardiac, pulmonary, or liver complications. LeBlanc was cleared for the hernia repair surgery.
On December 21, 1999, LeBlanc underwent hernia repair surgery, which was performed by Dr. Walsh. The EJGH Operative Report indicated that the patient tolerated the procedure well and left the operating room in good condition. LeBlanc was discharged that evening and returned home. That evening at home, LeBlanc had a violent episode of retching and felt a sharp tear in his abdomen. He was also vomiting blood and bleeding at the surgical site. LeBlanc returned to the emergency room of EJGH at 8:45 p.m. on December 21, 1999. Dr. Walsh again examined him and found that the violent retching associated with the vomiting had caused the muscle and fescia to tear. The emergency room records note that there was "some soak through bleeding to dsg." LeBlanc's pulse rate was recorded at 79 and his blood pressure was 100/54. Dr. Walsh ordered a complete blood count and complete metabolic profile.
Dr. Walsh performed a second surgery around 11:30 p.m. that night to repair the hernia with mesh and to place two abdominal drains at the incision site. The operative report indicates there was no evidence of visceral injury or active bleeding. The report also states that LeBlanc tolerated the procedure well and there were no complications. LeBlanc was placed in the Intensive Care Unit for recovery. At that time, his blood pressure was 130/82 and his pulse rate was 96. LeBlanc's oxygen saturation was 84% with 40% oxygen face tent. He was given a respiratory treatment and his oxygen saturation increased to 95%. LeBlanc's wife stated that when she saw her husband in the recovery room, he had an oxygen tent and was complaining that something was wrong and he couldn't breathe. The recovery room nurse noted that LeBlanc had been given a form of Keflex. Mrs. LeBlanc informed the nurse that her husband was allergic to Keflex. Dr. Walsh was allegedly notified of this situation by phone, but no examination of LeBlanc was performed. LeBlanc was transferred to a room in the medical unit at 2:30 a.m. with an oxygen tent and a pulse oximeter.
Joel Elam, a registered nurse, began her shift at 7:00 a.m. on December 22, 1999. She attended LeBlanc and her first entry at 7:40 a.m. stated that LeBlanc was restless and complaining of discomfort, the bilateral abdominal Blake drains were draining serosanguineous fluid, he had a continuous pulse, the oxygen face tent or mask was in place, and the oxygen level of his blood was in the upper 90's. At 8:00 a.m., Elam administered 8 mg of morphine. At 9:45 a.m., Elam called Dr. Walsh to report that LeBlanc was restless and anxious. His pulse rate, measured on a pulse-oximeter machine was elevated and fluctuating between 120 and 136. The machine also showed good oxygenation of his blood with readings of 97 and 98% and his blood pressure was fine. Dr. Walsh prescribed 1 mg of Ativan and 30 mgs of Toradol. Elam administered the Ativan at 10:05 a.m. and at 10:50 she administered the Toradol.
LeBlanc continued to be restless, however, Elam thought the actions were not *1252 abnormal in a post-operative patient. Elam spoke to LeBlanc's wife and knew that he had experienced problems before with anxiety after a prior surgery with anesthesia. Elam was also aware that LeBlanc drank a six-pack of beer per day and could have alcohol withdrawal symptoms like restlessness, anxiety, and increased heart rate. Mrs. LeBlanc testified that she saw blood on her husband's back, in the bed and on the floor at 10:00 a.m. Elam testified that she did not recall any significant amount of blood and stated that she would have documented it and would have notified the doctor had it been there. Hospital records indicate a linen change at 10:15 a.m. Mrs. LeBlanc also testified that her husband had pulled off his oxygen mask and said he could not breathe and was suffocating. Elam did not recall any complaint of difficulty breathing, however, LeBlanc was bothered by the face mask and did move it to the side.
At 11:15 a.m.-11:20 a.m., Elam called Dr. Walsh again to report that LeBlanc was still agitated and in pain. Elam and Dr. Walsh discussed LeBlanc's condition and vital signs. At 10:50 a.m. his pulse reading was 136 and at 11:10 a.m. his pulse reading was 120. Since LeBlanc had no chest pains, no shortness of breath, and no distension of his abdomen, Dr. Walsh only ordered additional Toradol. The second dose of Toradol was administered at 11:20 a.m. At 11:50, LeBlanc was resting with no complaints. At 11:55 a.m., Elam and a respiratory therapist switched the face mask to a nasal cannular to give LeBlanc 50% oxygen. At noon, LeBlanc's pulse rate was 80. At 12:20 p.m., his pulse rate was 100, while he was sleeping and his blood pressure was 140/82.
Elam noted that at 2:30 p.m., LeBlanc's Blake drains were disconnected and serosanguineous fluid had spilled onto the bed linens. Mrs. LeBlanc testified that there was a lot of blood on the bed, however, Elam testified that the fluid on the sheets had come from the small drain reservoirs and she would have notified the doctor had there been a lot of blood all over. Elam was able to measure 5 cc's of fluid in one reservoir and 10 cc's in the other. Elam continued to examine LeBlanc's surgical dressing and would have documented if it was no longer dry and intact. Elam administered another dose of Ativan to LeBlanc at 2:56 p.m., per Dr. Walsh's standing order.
Mrs. LeBlanc fell asleep next to her husband's bed around 4:00 p.m. She woke up at 4:30 p.m. to find that LeBlanc was not breathing. A "Code" was called by the hospital staff at 4:33 p.m., CPR was performed, and LeBlanc was totally unresponsive with a weak pulse. LeBlanc was transferred to the ICU at 5:00 p.m. and observed for several hours. He failed to respond with fixed and dilated pupils. LeBlanc received fluids, meds and was shocked in an attempt to resuscitate. These attempts were unsuccessful, and he was pronounced dead at 6:50 p.m.
An autopsy was performed by Dr. Joseph Trapani on December 23, 1999. He found that LeBlanc had atherosclerotic heart disease with 72% narrowing of the left anterior descending coronary artery. Dr. Trapani stated that the underlying cause of death was most likely the significant atherosclerosis of the left anterior descending coronary artery and microscopic evidence of both fibrosis and recent myocardial fiber degeneration. The immediate cause of death was cardiac arrhythmia due to myocardial ischemia.
Plaintiffs, the wife and children of LeBlanc, filed a claim against Dr. Walsh and EJGH with the Louisiana Patients' Compensation Fund. A medical review panel rendered an opinion and reasons on January 29, 2002. The medical review panel *1253 found that the evidence did not support a finding that Dr. Walsh failed to meet the applicable standard of care. The panel stated in its reasons that the surgery performed by Dr. Walsh was necessary and performed properly and the patient experienced a known complication of hernia surgery which was promptly recognized and treated appropriately. The panel also found that there was a material issue of fact, not requiring expert opinion, regarding liability, as to EJGH. In its reasons, the panel stated that the nurses followed the physician's orders, the physician was notified of the patient's change in condition appropriately, but there was a question of fact as to whether or not the nurses accurately reported the amount of bleeding to Dr. Walsh.
Plaintiffs then filed this medical malpractice action against Dr. Walsh and East Jefferson General Hospital in the 24th Judicial District Court. The case was tried as a bench trial on August 25-27, 2003, October 22-23, 2003, January 7-8, 2004, January 20, 2004 and January 29, 2004. A judgment was rendered by the trial court on May 26, 2004. The trial court found that Dr. Walsh and East Jefferson General Hospital both deviated from the standard of care in their fields, and found them to be equally at fault. The trial court awarded plaintiffs $100,000.00 for the pain and suffering of LeBlanc, $125,000.00 for general damages including the loss of love and affection for the children, $200,000.00 for general damages to the spouse, $17,318.38 for funeral expenses, $179,914.00 for loss of future earning capacity, $4,150.00 for future medical expenses from the treatment in the ICU for the code, plus all costs.
The trial court noted that Joel Elam, a nurse at EJGH, failed to report significant bleeding and breathing difficulties and a sustained abnormal heart rate. The court further noted that Dr. Walsh testified that he did not believe the reported heart rate was accurate, however, he failed to ask the nurse to confirm the rate.
The court went on to find that Dr. Walsh failed to investigate and rule out blood loss as the cause of the sustained heart rate. Dr. Walsh failed to visit LeBlanc despite two phone calls and a sustained abnormal heart rate. The trial court noted that there were missing notes from Dr. Walsh's emergency room treatment of LeBlanc before the second surgery and Dr. Walsh failed to reveal the abnormal liver function to the medical review panel, expert witnesses and plaintiffs' counsel. The trial court stated it gave great weight to the surviving spouse's testimony that her husband had significant bleeding from the surgical site and she reported to Dr. Walsh that her husband had vomited blood.
The trial court found that Dr. Walsh deviated from the standard of care by failing to properly monitor LeBlanc who had shown signs of bleeding from the first surgery, suffered from chronic pulmonary disease and had undergone two surgeries under general anesthesia within twelve hours. The trial court found that East Jefferson General Hospital deviated from the standard of care through its employee, Nurse Elam, who failed to report that LeBlanc had significant bleeding, a sustained elevated heart rate, breathing difficulties, and signs of hypovolemia.
The trial court also pointed out the testimony of Simone Jacob Lewis, a registered nurse who was qualified as an expert in nursing. The trial court noted that Lewis testified at trial that it was a deviation from the standard of care for nursing staff to fail to call the doctor when LeBlanc began pulling his oxygen mask off and complaining of difficulty breathing. She also testified that it was a deviation of the *1254 standard of care for Elam to fail to report an elevated heart rate and the standard of care requires a nurse to report a change in the character of the fluid from the surgical drain.
Thereafter, plaintiffs filed a motion for new trial and to amend the judgment. A hearing on the motion was held on June 22, 2004 and on July 27, 2004, the trial court granted the motion for new trial and to amend the judgment for the purpose of vacating portions of the judgment rendered on May 26, 2004, and amending the judgment. The trial court's reasons remained the same, however, the apportionment of fault and damages awards were clarified.
By the judgment dated July 27, 2004, the trial court clarified that Dr. Walsh and Hospital District No. 2, for the Parish of Jefferson, d/b/a East Jefferson General Hospital were each 50% at fault and that plaintiffs and Ronald LeBlanc, Sr. were free from fault. The trial court awarded Annette C. LeBlanc, the wife of LeBlanc, $426,382.38, Dr. Ronald A. LeBlanc, Jr. $150,000.00, Jeanelle M. Stein $150,000.00, and Jason LeBlanc $150,000.00. The trial court also awarded special damages in the amount of $201,382.38. Total general damages awarded were $675,000.00, making a total damage award to all plaintiffs of $876,382.38. Pursuant to the Louisiana Medical Malpractice Act, the trial court reduced the total award to $504,150.00, plus interest from the date of demand and allowable costs.

DISCUSSION
Dr. Walsh, Hospital District No. 2 d/b/a East Jefferson General Hospital, and the Louisiana Patients' Compensation Fund now appeal the trial court's judgment. Dr. Walsh has asserted five assignments of error: 1) the trial court's assignment of fault was manifestly erroneous, 2) the trial court erred in ruling that Dr. Walsh breached the standard of care for practitioners of general surgery in failing to properly monitor a patient who had signs of bleeding from the first surgery, 3) the trial court erred in ruling that Dr. Walsh breached the standard of care for practitioners of general surgery in failing to properly monitor a patient who suffered from chronic pulmonary disease, 4) the trial court erred in failing to recognize that Ronald LeBlanc, Sr. died of known complications of surgery, and 5) the trial court erred in finding that Dr. Walsh's failure to adhere to applicable standards of care for practitioners of general surgery was a cause in fact of the damages suffered by LeBlanc.
East Jefferson General Hospital asserts three assignments of error on appeal: 1) the trial court erred in its finding of liability, gave inappropriate weight to the testimony of the plaintiff, a lay person, that was directly contradicted by objective evidence and expert testimony, 2) the plaintiffs did not establish any action on the part of East Jefferson General Hospital that was a cause in fact of LeBlanc's death, and 3) the trial court erred when it failed to assign a portion of fault to LeBlanc.
The Louisiana Patients' Compensation Fund has asserted two assignments of error: 1) the district court erred in finding the plaintiffs had carried burden of proving the alleged malpractice caused damages in excess of $100,000.00, 2) the district court erred in concluding that the defendant hospital and surgeon were 50% at fault and had caused damages in excess of $100,000.00 because the plaintiff sustained no clinically significant bleeding, no clinically significant breathing difficulties, the intermittent elevated heart rate did not cause cardiac arrest, and there were *1255 no signs of hypovolemia causing cardiac arrest.
Since the assignments of error asserted by all three appellants in this case are related and address similar issues, we will address them together in this opinion and consider each part of the trial court's findings. We also note that the Louisiana Patients' Compensation Fund has the statutory right to appeal this matter under the Louisiana Medical Malpractice Act, La. R.S. 40:1299.41, which provides that it may seek review of any judgment that requires payment over $100,000.00 by the Fund.
For the following reasons, we affirm the trial court's judgment and agree that Dr. Walsh and East Jefferson General Hospital both breached the standards of care that apply to each. We also agree with the trial court's apportionment of fault at 50% to each defendant, Dr. Walsh and East Jefferson General Hospital. Finally, we affirm the trial court's damage awards and affirm the reduction in those awards, pursuant to the Louisiana Medical Malpractice Act, to $504,150.00, plus interest and cost.
In a medical malpractice action against a doctor, plaintiffs must prove that the doctor's treatment fell below the standard of care expected of a physician in his medical specialty and that the existence of a causal relationship between the alleged negligent treatment and the injury sustained. Fusilier v. Dauterive, 2000-151 (La.7/14/00), 764 So.2d 74. In an action against a hospital, the plaintiffs must prove that the hospital personnel negligently departed from the recognized standard of care afforded by hospitals in the area, and that departure was a cause of the injury sustained. Dean v. Ochsner Medical Foundation Hosp. and Clinic, 99-466 (La.App. 5 Cir. 11/10/99), 749 So.2d 36. This Appellate Court may not set aside the factual findings made by the trier of fact in the absence of manifest error and this manifest error rule applies in appeals of medical malpractice actions. Rebstock v. Hospital Service Dist. No. 1, 01-659 (La.App. 5th Cir.11/27/01), 800 So.2d 435, writ denied, XXXX-XXXX (La.3/15/02), 811 So.2d 914.

Breach of the Applicable Standard of Care
We find, as the trial court did, that Dr. Walsh and East Jefferson General Hospital both deviated from their applicable standards of care, and these deviations were the cause of LeBlanc's death. Dr. Walsh treated LeBlanc from the time he first reported with symptoms of the hernia. Nurse Elam was an employee of EJGH and she cared for LeBlanc during his recovery from the second surgery. Nurse Elam did not notice symptoms LeBlanc was exhibiting that warned something was wrong and she failed to tell Dr. Walsh about the bleeding and breathing difficulties LeBlanc was experiencing. Dr. Walsh failed to question Nurse Elam or to investigate on his own to find out why LeBlanc had a sustained high heart rate. Dr. Walsh did not go to LeBlanc's room at the hospital to personally examine him even though Nurse Elam was reporting the abnormal heart rate.
Dr. Robert Roberts testified at the trial of this matter and was qualified as an expert in the field of cardiology. He testified that he believed the applicable standard of care would require a nurse to report to a physician if the patient complained of restlessness and had a heart rate fluctuating between 120 and 136, as LeBlanc did. He testified that a surgeon should have called a cardiac consult if he knew of these things because a persistent increase in the heart rate indicates an abnormality. Dr. Roberts testified that it is not appropriate to simply attribute an *1256 increased heart rate to post surgical pain and agitation and treat it with sedatives and painkillers. Dr. Roberts felt that the cause of LeBlanc's death was most likely arrhythmia, or irregular heartbeat, precipitated by a combination of lung disease and an increased heart rate with myocardial ischemia. He further explained that a normal heart rate for an adult male is 60-80 and a sustained high heart rate can cause an arrhythmia. Dr. Roberts testified that he would be concerned about anyone with a heart rate over 100 for an hour or two. According to the nursing notes, LeBlanc's highest recorded heart rate was 150 and was 120 or more on more than one occasion. Dr. Roberts stated that it is probable that, had a cardiologist consult been called, the heart rate could have been lowered and the source of the increased heart rate identified and dealt with successfully. Dr. Roberts testified that it is probable that LeBlanc could have been successfully treated for the increased heart rate and that blood loss could have contributed to the problems LeBlanc was experiencing.
Dr. Louis Silverman also testified at trial and was qualified as an expert in general, thoracic, and cardiovascular surgery. He testified that it was a deviation from the applicable standard of care to discharge a patient to go home without a surgeon examining a wound site that had bled through the bandage, like LeBlanc's had after the first surgery. Dr. Silverman also testified that it was a deviation of the applicable standard of care on the part of hospital personnel that did observe the bleeding, to not inform the surgeon. Further, Dr. Silverman testified that he would have called a cardiac consult when LeBlanc had an elevated heart rate, and it was a deviation from the standard of care for Dr. Walsh not to call a consult given LeBlanc's history and the elevated heart rate. Dr. Silverman stated that he believed LeBlanc died from an arrhythmia, secondary to an ischemic heart, secondary to hemorrhage.
Finally, Simone Jacob Lewis, a registered nurse, testified at trial and was qualified as an expert in nursing. She testified that it was a deviation from the standard of care for the nursing staff to fail to call the doctor when LeBlanc pulled off his oxygen mask and complained of difficulty breathing. She further testified that it was a deviation of the standard of care for Nurse Elam to fail to report an elevated heart rate to Dr. Walsh.
Based on the evidence presented at trial and the expert testimony, it is clear that both Dr. Walsh and East Jefferson General Hospital, through it employee Nurse Elam, deviated from the standard of care required of them and these deviations were a cause of LeBlanc's death. Therefore, we find that the trial court's judgment is not manifestly erroneous.

Apportionment of Fault
As discussed above, both East Jefferson General Hospital, through Nurse Elam, and Dr. Walsh deviated from their applicable standards of care and that deviation was a cause of LeBlanc's death. The trial court correctly apportioned fault at 50% for each Dr. Walsh and the Hospital. The nurse failed to notice certain problems with LeBlanc post-surgery, including the blood loss, and failed to adequately inform Dr. Walsh of LeBlanc's condition, including his persistent elevated heart rate. Dr. Walsh failed to personally check on LeBlanc even though he was receiving some abnormal reports from the nurse. He also failed to follow-up with a cardiac consult, or other necessary actions, when he was notified of problems with LeBlanc's condition.
Therefore, we agree with the trial court that Dr. Walsh and EJGH were equally at *1257 fault in causing the death of LeBlanc and we find the trial court's judgment, as it relates to the apportionment of fault, was not manifestly erroneous.

Damages
Finally, we find that the trial court's award of damages to the plaintiffs is not manifestly erroneous. The trial court awarded special damages in the amount of $201,382.38. This represents $179,914.00 for loss of future earnings, support, and services, $17,318.38 for funeral expenses, and $4,150.00 for future medical expenses, which were incurred in the ICU after the code was called. We find plaintiffs are entitled to these damages and the trial court correctly awarded that amount.
The trial court awarded a total of $675,000.00 in general damages. The trial court awarded each plaintiff damages for loss of love and affection and gave them each damages according to La. C.C. art. 2315.1, which provides for the right to recover damages for injury by the surviving family members. Plaintiffs included LeBlanc's wife, Annette, his son, Dr. Ronald LeBlanc, Jr., his daughter, Jeannelle Stein, and his son, Jason LeBlanc. The trial court awarded Annette, as the spouse, $200,000.00 for loss of love, affection, society and consortium, plus $25,000.00, representing her pro rata share of Article 2315.1 damages. Each child was awarded $125,000.00 each for loss of love and affection and their pro rata shares of $25,000.00 each for Article 2315.1 damages. We find the damage awards for the loss of love and affection to be warranted and further find the plaintiffs are entitled to damages pursuant to La. C.C. art. 2315.1. Therefore, we find no error in these damage awards to plaintiffs.
We also agree with the trial court's reduction of these damages to $504,150.00 pursuant to the Louisiana Medical Malpractice Act due to the cap placed on all damage awards under this Act.
In accordance with the above, we affirm the trial court's judgment in favor of plaintiffs and affirm the trial court's award of $504,150.00 in damages.
AFFIRMED.