888 So.2d 953 (2004)
Howard HARGRODER, Plaintiff-Appellee
v.
Dr. Steven UNKEL, et al., Defendants-Appellants.
No. 39,009-CA.
Court of Appeal of Louisiana, Second Circuit.
October 29, 2004.
*955 Hudson, Potts & Bernstein, L.L.P., by Gordon L. James, Monroe, for Appellant, Dr. Steven P. Unkel.
Sera H. Russell, III, Lafayette, for Appellee.
Before GASKINS, PEATROSS and LOLLEY, JJ.
GASKINS, J.
The defendant, Dr. Steven P. Unkel, appeals a jury verdict awarding $150,000 to the plaintiff, Dr. Howard Hargroder, for the loss of a chance of a better outcome arising from a stroke. For the following reasons, we affirm in part and amend in part the trial court judgment.

FACTS
The plaintiff, a resident of Eunice, Louisiana, is a veterinarian. He was employed as a relief inspector for the United States Department of Agriculture, traveling throughout several states to fill in for inspectors who were on leave. On June 30, 1998, while working at the ConAgra plant in Farmerville, Louisiana, the plaintiff became ill. He left work and went to the cabin he and his wife were renting while in the area. Around 9:30 p.m., the plaintiff's wife took him to the emergency room of Union General Hospital (Union General). He stated that he had been vomiting all day, was dizzy, and had numbness in his left extremities.
*956 At that time, Union General did not have a full-time emergency room physician. Doctors with privileges at the hospital were on call at the emergency room on a rotating basis. On the evening the plaintiff sought treatment, Dr. Unkel was on call. The plaintiff was examined by the emergency room nurse. The plaintiff said that he told the nurse that he thought he was having a stroke.
Dr. Hargroder is diabetic. Both his blood sugar and blood pressure were elevated. His hand grips were equal bilaterally. The nurse telephoned Dr. Unkel who ordered an EKG and a cardiac enzyme study. Dr. Unkel did not come to the hospital, but ordered tests to rule out a heart attack. The plaintiff was diagnosed with viral enteritis, a stomach malady that was circulating in the community. Dr. Unkel ordered that the plaintiff be given medication for nausea. The plaintiff slept briefly, and was discharged at 11:25 p.m.
Dr. Hargroder continued to be nauseated. Around 4:00-5:00 a.m. the next morning, July 1, 1998, Mrs. Hargroder called the emergency room and took the plaintiff back around 6:00 a.m. Dr. Unkel came to the emergency room. He found the plaintiff's blood pressure and blood sugar were still elevated and performed a neurological exam which he claims was normal. Dr. Unkel did not think that the plaintiff was having a stroke. He attributed the numbness in the plaintiff's left hand to diabetic neuropathy. The plaintiff was discharged from the emergency room.
The plaintiff continued to be sick and on July 3, 1998, the Hargroders decided to return to Eunice. Mrs. Hargroder stopped at the emergency room of Savoy Medical Center in Mamou, Louisiana. The plaintiff was seen by Dr. Oscar Rodriguez, who ordered a CT scan and an MRI. Both tests were normal, but Dr. Rodriguez determined that Dr. Hargroder had suffered a stroke.
The plaintiff was admitted to the hospital and was treated with heparin, a blood thinner. His symptoms began to improve. He then underwent rehabilitation and was discharged on July 21, 1998.
In August 1998, Dr. Hargroder sustained broken ribs in a fall from a ladder while trimming trees. The defendant contends that the plaintiff's return to work was delayed by a cruise to Alaska. Dr. Hargroder retired in 2000. He claimed to have continued weakness in his left side and stated that he retired because he could not do what needed to be done.
Dr. Hargroder filed a medical malpractice suit against Dr. Unkel and Union General, claiming damages for Dr. Unkel's failure to diagnose and treat the stroke. On November 16, 2000, a medical review panel found that Union General did not deviate below the applicable standard of care. The panel found that Dr. Unkel deviated from the accepted standard of care, but the deviation did not affect the outcome of the patient's care. Members of the medical review panel included Drs. David A. Yarbrough, Brian Harris, and Kenneth E. McDonald, III, who testified at trial.
On April 4, 2002, the trial court granted a motion for summary judgment filed by Union General, dismissing the plaintiff's claims against it. The plaintiff proceeded to jury trial against Dr. Unkel. At the close of the defendant's case, the trial court granted a directed verdict against Dr. Unkel finding that he breached the applicable standard of care. The jury awarded Dr. Hargroder $150,000 in damages for failure to diagnose and treat his stroke.
Dr. Unkel filed motions for judgment notwithstanding the verdict and for new trial, arguing that the plaintiff did not *957 establish a loss of a better outcome due to the delay in the diagnosis. These motions were denied by the trial court.
The defendant appealed, arguing that the jury erred in making an award for loss of a chance of a better outcome when the medical testimony established that there was no treatment available for a better outcome and that the outcome obtained was excellent. He also alleged that the jury erred in making an award for loss of a better outcome which involved only a loss of a chance for supportive care, which did not affect the ultimate outcome, and which involved a good result.

LEGAL PRINCIPLES
An appellate court may not set aside a trial court's factual findings unless they are manifestly erroneous or clearly wrong. Henderson v. Nissan Motor Corporation, 2003-606 (La.2/6/04), 869 So.2d 62. For reversal on appeal, the appellate court must find: (1) a reasonable factual basis does not exist in the record for the factual findings of the trial court; and (2) the record establishes that the factual findings are clearly wrong and manifestly erroneous. The appellate court must do more than look at the record for evidence which supports or discredits the trial court's findings. The reviewing court must review the entire record to determine whether the trial court's findings were clearly wrong or manifestly erroneous. Johnson v. LSU Medical Center, 38,204 (La.App.2d Cir.3/3/04), 867 So.2d 884, writ denied, XXXX-XXXX (La.6/4/04), 876 So.2d 88.
Credibility determinations, including the evaluation of expert testimony, are factual issues to be resolved by the trier of fact. Where the testimony conflicts, the fact finder's reasonable evaluation of credibility and reasonable inferences of fact should not be disturbed upon review, even where the appellate court may feel that its own evaluations and inferences are more reasonable than those of the jury. Quinn v. Wal-Mart Stores, Inc., 34,280 (La.App.2d Cir.12/6/00), 774 So.2d 1093, writ denied, XXXX-XXXX (La.3/9/01), 786 So.2d 735.
In the determination of general damages, the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. La. C.C. art. 2324.1. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. The primary considerations in the assessment of damages are the severity and duration of the injured party's pain and suffering.
Only after an abuse of discretion is disclosed by an articulated analysis of the facts is an examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff, which reasonably could have been made by the trier of fact. Rice v. Liles 38,840 (La.App. 2 Cir. 9/24/04), 882 So.2d 751.
The damage claimed in this case, loss of a chance of a better medical outcome, has its basis in cases dealing with loss of a chance of survival. Smith v. State Department of Health and Hospitals, 95-0038 (La.6/25/96), 676 So.2d 543. *958 The issues in a loss of a chance of survival case are whether the tort victim lost any chance of survival because of the defendant's negligence and the value of that loss. The question of degree may be pertinent to the issue of whether the defendant's negligence caused or contributed to the loss, but such a tort-caused loss in any degree is compensable in damages. In such cases, the factfinder is to focus on the chance of survival lost on account of malpractice as a distinct compensable injury and to value the lost chance as a lump sum award based on all the evidence in the record, as is done for any other item of general damages. Smith v. State Department of Health and Hospitals, supra.
In Graham v. Willis-Knighton Medical Center, 97-0188 (La.9/9/97), 699 So.2d 365, this approach was expanded to allow recovery to a plaintiff for loss of a chance of saving a limb. In that case, failure to timely restore blood flow to the plaintiff's leg following surgery for a gunshot wound resulted in the loss of the leg.

EVIDENCE AND TESTIMONY
We now examine the evidence to determine whether the plaintiff carried his burden of showing that, due to the delay in his treatment, he lost the chance to have a better recovery from his stroke.
Dr. Hargroder testified that his symptoms began around 4:00 p.m. on June 30, 1998. That evening when he went to the Union General emergency room, he told the nurse that he thought he was having a stroke. He also told this to Dr. Unkel who disagreed with the plaintiff. According to Dr. Hargroder, as soon as he started receiving an anticoagulation medication called heparin at the Savoy Medical Center in Mamou, three days after the onset of his symptoms, he began improving. The plaintiff testified that he has not fully recovered from his stroke. He still has numbness, weakness, and loss of control and feeling on the left side of his body. He testified that he cannot button his wallet pocket because his hand is numb.
Mrs. Hargroder testified that after the plaintiff began receiving heparin at the hospital in Mamou, he improved rapidly.
Dr. Oscar Rodriguez, the internal medicine doctor who treated the plaintiff in Mamou, testified that after evaluating the plaintiff's CT and MRI results, he suspected that the plaintiff had small vessel disease. He stated that a medication called tPA can help some stroke patients in certain instances if given within three hours of the onset of stroke symptoms. However, Dr. Hargroder was far outside this window of opportunity for tPA to be used. Dr. Rodriguez administered heparin, an anticoagulation medication, to the plaintiff and his symptoms began to improve.
Dr. Harris, a member of the medical review panel, testified that tPA is a drug that can be administered in some instances to stroke patients. A CT scan is necessary before treatment to determine that there is no bleeding in the brain. Dr. Harris noted that the plaintiff eventually improved after he was given heparin. However, he stated that whatever Dr. Unkel did or failed to do had no effect on the plaintiff's outcome.
Dr. Yarbrough, a member of the medical review panel, testified that tPA is a medication that can be used in stroke patients in some instances. If the use of tPA is determined to be appropriate, it must be administered within three hours of the onset of stroke symptoms. He said that sometimes heparin can be used for stroke patients, but there is some thought that heparin has no positive effect. He stated that in this case, where the plaintiff had stroke symptoms for three days, it would be hard to say if the stroke was starting to resolve itself or if the heparin had any benefit.
*959 Dr. McDonald, a family practice physician who was a member of the medical review panel, stated that tPA can be used in stroke patients in specific circumstances. He said that he did not think that heparin would be effective when administered more than three hours after the onset of a stroke. Dr. McDonald testified that he sometimes administers steroids in an attempt to prevent some of the brain swelling that can occur. However, he acknowledged that he was not sure whether steroids actually help stroke victims.
The deposition of Dr. Steven Rees was admitted at trial. Dr. Rees is a physical medicine and rehabilitation physician who oversaw Dr. Hargroder's rehabilitation. Dr. Hargroder was hospitalized for rehabilitation from July 7, 1998, until July 21, 1998. On July 6, 1998, Dr. Rees first evaluated the plaintiff, who had difficulties with fine motor coordination and had some numbness. Dr. Rees stated that Dr. Hargroder had good return from his initial neurological deficits, but the fine motor coordination difficulties led to the need for rehabilitation.
On July 9, 1998, Dr. Rees noted that Dr. Hargroder was doing well with therapy, but had continued weakness, more in the lower extremities that in the upper extremities. On July 16, 1998, Dr. Rees observed that the plaintiff was making good progress in his rehabilitation, but complained of numbness and tingling in his left hand. Dr. Hargroder was discharged from rehabilitation on July 21, 1998 and had a follow-up office visit with Dr. Rees on September 17, 1998. At that time, the plaintiff was doing well, but Dr. Rees did not remember whether the plaintiff had any lingering numbness. He stated that he did not have any indication in his records that Dr. Hargroder had continuing sensory difficulties.
When questioned about the possible treatments for a stroke, Dr. Rees stated that a stroke cannot be stopped. He said that in some patients, tPA may be effective, but it must be administered within eight hours of the onset of symptoms. Dr. Rees testified that if Dr. Hargroder had no prior damage and if it had been determined that he was experiencing a thrombotic cardiovascular accident, then tPA might have been used and might have prevented the spread of damage.

LOSS OF A CHANCE OF A BETTER OUTCOME
The plaintiff argued that there were several options available for treatment of his stroke that he was deprived of by Dr. Unkel and, as a result, he did not recover as fully as he might have. He claims these options included tPA, heparin, and steroids.
The defendant contends that the evidence failed to show that any effective treatment was available for the plaintiff. Therefore, the plaintiff failed to show any loss of a chance of a better outcome due to the delay in treatment. The testimony showed that, after a determination that the plaintiff was not experiencing a hemorrhagic stroke, tPA would have been a valid treatment option if administered within three to eight hours of the onset of the first stroke symptoms. In this case, Dr. Unkel did not have the necessary equipment for a CT scan or an MRI to determine whether the plaintiff was having a stroke and to determine its type. He also failed to refer the plaintiff to a hospital with the necessary equipment. There is some dispute among the experts about the window of opportunity for the administration of tPA. The defendant argues that, because the plaintiff did not go to the emergency room until many hours after the onset of his symptoms, tPA was not an option for him. However the jury heard testimony that tPA could have been administered up until eight hours after the stroke symptoms commenced.
*960 The defendant claims that there is some dispute in the medical community as to the effectiveness of heparin in the treatment of strokes. However, the jury heard testimony from the plaintiff, Mrs. Hargroder, and Dr. Rodriguez that Dr. Hargroder's symptoms began to improve as soon as he began to receive heparin. There was also testimony that steroids may have been a treatment option.
Dr. Hargroder testified that he did not make a complete recovery from his stroke. He continues to have numbness and weakness on the left side of his body. His wife testified that he sometimes has trouble walking as a result of the stroke.
Based upon the record, the jury did not abuse its discretion in finding that the plaintiff lost some chance of a better outcome. We affirm that portion of the trial court judgment.

AMOUNT OF DAMAGES
However, we find that the jury award of $150,000 for loss of a chance of a better outcome is not supported by the record and is unreasonably excessive under the facts of this case.
In Graham v. Willis-Knighton Medical Center, supra, the supreme court provided guidance for calculating damages in cases of a loss of a chance of survival or the loss of a chance of a better outcome. According to the court, when the chance of survival, or in that case of saving a leg from amputation, is less than 50 percent, the court may not award full damages for the loss. Rather, the factfinder, judge or jury, focuses on the chance of survival or the chance of saving the leg that has been lost because of the malpractice and values the lost chance as a lump sum award based on all the evidence in the record, as is done for any other item of general damages.
The court noted that the loss of a less-than-even chance of survival, or, in that case, the chance of saving a limb, is a distinct injury compensable as general damages which cannot be calculated with mathematical certainty, and the factfinder should make a subjective determination of the value of that loss, fixing the amount of money that would adequately compensate the claimants for that particular cognizable loss. Graham v. Willis-Knighton Medical Center, supra.
In Graham v. Willis-Knighton Medical Center, supra, the court considered that an award of $470,000 would have been appropriate for the loss of the leg, and that the plaintiff had a less-than-even chance of saving the leg had surgery been performed timely. Because the chance of saving the leg was in the range of 20 to 33 percent, an appropriate award in the case would have been $140,000.
In the present case, the record supports a finding that the plaintiff had a less-than-even chance of a better recovery from the stroke had he been timely diagnosed and treated. However, it appears that the jury considered that the entire residual deficit suffered by Dr. Hargroder as a result of the stroke was caused by Dr. Unkel's failure to diagnose and treat the stroke. As a result, the amount awarded is excessively high. Rather, the jury was to consider the degree of loss of chance of a better outcome and award a lump sum for that element of damage, as is done for any other item of general damages.
In this matter, the record does not support an award of $150,000 for this element of damages. While Dr. Hargroder suffers some continuing effects of the stroke which may have been alleviated to some extent by timely diagnosis and treatment, for the most part, he made a good recovery. Dr. Hargroder did not present evidence as to the percentage of disability he suffered as a result of this stroke. Because the record contains scanty evidence as to the degree of damage suffered, the *961 jury award of $150,000 is excessively high. Accordingly, we must reduce the award to the highest amount that the trier of fact could have reasonably awarded. We find that the highest amount that could be awarded for the loss of a chance of a better outcome in this case is $75,000.

CONCLUSION
For the reasons stated above, we affirm the jury verdict in favor of the plaintiff, Dr. Howard Hargroder, against the defendant, Dr. Steven Unkel, finding that the plaintiff suffered the loss of a chance of a better medical outcome arising from the defendant's failure to diagnose and treat the plaintiff's stroke. We find that the jury's award of $150,000 for this element of damages is excessively high. Accordingly, we amend and reduce the award to $75,000.
AFFIRMED IN PART; AMENDED IN PART; AND AS AMENDED, AFFIRMED.