JUDE G. GRAVOIS, Judge.
|2In this medical malpractice suit, plain-tiflyappellant, Harold Pesses, appeals a trial court judgment finding that he failed to bear his burden of proof regarding the negligence of defendant/appellee, Dr. Nicholas J. Angelica, in failing to- call for an emergency cardiac consultation, causing him the loss of a chance for a better medical outcome following a heart attack. For the reasons that follow, we reverse, award damages, and render judgment in favor of plaintiff.

FACTS AND PROCEDURAL HISTORY

On February 11, 2007, plaintiff, Harold Pesses, a 53-year-old man, presented to the emergency room at East Jefferson General Hospital (“EJGH”) with chest pain. He reported to the emergency room physician that he ate an apple fritter earlier that day and feared that it was stuck in his esophagus.[1] The medical records show that the emergency room physician considered this a gastrointestinal (“GI”) case and ordered a variety of tests to rule out a GI event. An endoscopy was performed, which located remnants of the fritter, but showed that there was no |slonger any obstruction. Plaintiff was administered a “GI cocktail” that temporarily relieved some of his symptoms, though his pain did not fully abate.[2] An electrocardiogram *135 (“EKG”) was performed in the emergency room, as well as a cardiac enzyme workup (a blood test), which showed elevation in two of the four cardiac enzymes, but normal levels in the other two.
Because of these results and his continued complaints of chest pain, plaintiff was admitted to the hospital’s telemetry floor around 8:50 p.m. that evening, specifically for cardiac monitoring in order to rule out a heart attack. This admission was made by Dr. Joseph Hauth,.the emergency room physician, in consultation with defendant, Dr. Angelica, an internist and the on-call physician at EJGH that evening for “unre-ferred” patients.[3] Plaintiff saw a cardiologist, Dr. Clement Eisworth, approximately eight years earlier for an evaluation after his brother developed heart disease and required a stent in his 40s. However, plaintiff was not under the care of a cardiologist when he was admitted to EJGH.
Plaintiff continued to report chest pain throughout that evening and night.[4] Following plaintiffs admission, Dr. Angelica ordered repeat cardiac enzyme labs, an echocardiogram to be performed in the morning, and a cardiology consultation in the morning as well.
The record shows that the second cardiac enzyme labs were drawn later during that night at 1:36 a.m. The results, which were obtained around 2:50 a.m., now showed that all four cardiac enzymes were elevated beyond normal limits. A nurse contacted Dr. Angelica with these results, but according to his testimony, informed him only about the elevation of the Tropo-nin level, one of the enzymes, |4but not the other three. He testified that he was told that otherwise, plaintiffs condition was stable with no changes in the telemetric monitoring or vital signs, and with no worsening chest pain.
In response to the information received at 2:50 a.m., Dr. Angelica issued no new orders. Plaintiffs chest pain essentially resolved by daybreak that morning. He was evaluated around 8:30 a.m. by Dr. Gregory Tilton, a cardiologist, who performed an angiogram that afternoon.[5] The angiogram showed an occlusion (an obstruction) at the ostium (opening) of the first diagonal branch artery. Dr. Tilton declined to perform angioplasty, which is the placing of a stent to open the vessel. He was not called to testify, but his procedure notes, introduced into evidence, indicate that he felt angioplasty was not appropriate at that time because Mr. Pesses’ heart muscle had already sustained permanent damage by the time of the angiogram, as indicated by test results and his findings, thus rendering a stent moot,[6] and also because the location of the obstruction in the diagonal vessel would be difficult to stent due to the high possibility of causing major damage to a larger vessel, the left anterior descending artery, which is located nearby.
Each expert physician who testified, either live or via deposition, said that plain *136 tiff suffered a non-ST segment elevation myocardial infarction (“M.I.”) (“non-STEMI”) (heart attack), as opposed to a ST segment elevation myocardial infarction (“STEMI”). The latter appears differently in telemetric monitoring and involves large areas of muscle mass, whereas the non-STEMI variety typically involves smaller areas of cardiac muscle.
On July 28, 2009, plaintiff filed suit against Dr. Angelica and Louisiana Medical Mutual Insurance Company (“LAM-MICO”), his medical malpractice | liability insurer.[7] In his petition for damages, plaintiff contented that Dr. Angelica’s failure to call for an immediate emergency cardiac consultation upon receiving the cardiac enzyme lab results at 2:50 a.m. breached the standard of care and essentially deprived him of a chance to have a better medical outcome. Specifically, he alleged that he “suffered permanent and irreversible heart damage which more probably that not would have been prevented or minimized through a timely cardiac catheterization procedure, angioplasty and/or by-pass surgery to restore the integrity of blood flow to the affected areas of the heart.” A medical review panel previously found that “[t]he evidence does not support the conclusion that [Dr. Angelica] failed to meet the applicable standard of care as charged in the complaint.”
A bench trial was conducted on August 19, 2013, and on October 1, 2013, the trial court rendered judgment in favor of defendants, dismissing plaintiffs petition with prejudice, with each party to bear their own costs. In findings of fact and reasons for judgment filed that same day, the trial court found that Dr. Angelica did indeed deviate below the standard of care when he failed to order an immediate cardiology consultation after being informed of the increase in cardiac énzymes at 2:50 a.m. Telling, according to the trial court, was the testimony of Dr. Jeffrey Coco, one of appellees’ experts, who testified that although he did not believe in his opinion that Dr. Angelica breached the standard of care, he personally would have ordered a cardiology consultation at 2:50 a.m. had plaintiff been his patient.
The trial court further found, however, that Dr. Angelica’s breach of the standard of care was not a proximate cause of the damages alleged to have been |fisustained by plaintiff, finding that “the claim for a lost chance of saving Mr. Pesses’ heart muscle is highly speculative, and not supported by the testimony presented at trial.” Further, the trial court found specifically that “Dr. Angelica’s deviation below the standard of care did not cause Mr. Pesses to suffer any damages that he would not have otherwise suffered.” Plaintiffs appeal followed.
On appeal, plaintiff argues that the trial court erred in finding that he failed to prove that Dr. Angelica’s breach of the standard of care was a proximate cause of his damages, in failing to award him damages, and in failing to allow him to testify about various statements allegedly made by his treating cardiologist. Plaintiff also argues that the trial court committed legal error in its application of the loss of chance doctrine, and thus urges this Court to conduct a de novo review of the evidence.

ANALYSIS

The burden of proof in a malpractice suit is governed by La. R.S. *137 9:2794(A). When a. medical malpractice action is brought against a physician, the plaintiff must establish the standard of care applicable to the physician, a violation of that standard of care by the physician, and a causal connection between the physician’s alleged negligence and the plaintiffs resulting injuries. Moore v. Smith, 48,954 (La.App. 2 Cir. 5/21/14), 141 So.3d 323, 332, citing Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228, and Johnson v. Morehouse Gen’l Hosp., 10-0387 (La.5/10/11), 63 So.3d 87. The loss of a chance of a better recovery must be proven by a preponderance of the evidence, as in any tort case. Straughan v. Ahmed, 618 So.2d 1225 (La.App. 5 Cir.1993), writ denied, 625 So.2d 1033 (La.1993).
The appellate court may not set aside the factual findings made by the trier of fact in the absence of manifest error. Sumter v. W. Jefferson Med. Ctr., 02-1103 (La.App. 5 Cir. 4/29/03), 845 So.2d 1179, 1181, writ denied, 03-1484 (La.9/26/03), 854 So.2d 367. The manifest error rule applies in appeals of medical malpractice actions. Id., citing Rebstock v. Hospital Service Dist. No. 1, 01-659 (La.App. 5 Cir. 11/27/01), 800 So.2d 435, writ denied, 02-0077 (La.3/15/02), 811 So.2d 914. Causation in medical malpractice cases is subject to' the manifest error standard of review. Id.
In considering expert testimony, a trial court may accept or reject in whole or in part the opinion expressed by an expert. The effect and weight to be given to expert testimony is within the broad discretion of the trial judge. Phillip Family L.L.C. v. Bayou Fleet P’ship, 12-565 (La.App. 5 Cir. 2/21/13), 110 So.3d 1158, 1167-68, writ denied, 13-0641 (La.4/26/13), 112 So.3d 846 (internal citations omitted). The trier of fact may accept or reject any expert’s view, even to the point of substituting its own common sense and judgment for that of an expert witness where, in the fact-trier’s opinion, such substitution appears warranted by the evidence as a whole. Id. The decision reached by the trial court regarding expert testimony will not be disturbed on appeal absent a finding that the trial court abused its broad discretion. Id., citing Fishbein v. State ex rel. LSU Health Sciences Center, 06-0549 (La.App. 1 Cir. 3/9/07), 960 So.2d 67, 73, writs denied, 07-0730, 07-0708 (La.6/22/07), 959 So.2d 495, 505.
A claim for a loss of a chance of a better medical outcome has its basis in cases dealing with loss of a chance of survival. Hargroder v. Unkel, 39,009 (La.App. 2 Cir. 10/29/04), 888 So.2d 953, 957, writ denied, 04-2908 (La.2/4/05), 893 So.2d 874, citing Smith v. State, Dept. of Health and Hospitals, 95-0038 (La.6/25/96), 676 So.2d 543. The issues in a loss of chance case are whether the tort victim lost any chance because of the defendant’s negligence and the value of that loss. The question of degree may be pertinent to the issue of whether the ^defendant’s negligence caused or contributed to the loss, but such a tort-caused loss in any degree is compensable in damages. In such cases, the factfinder is to focus on the chance lost on account of the malpractice as a distinct compensable injury and to value the lost chance as a lump sum award on all the evidence in the record, as is done for any other item of general damages. Id. at 958. Thus, by extrapolation, in a medical malpractice case seeking damages for the loss of a better medical outcome because of a physician’s breach of the standard of care (negligence), the plaintiff must prove by a preponderance of the evidence that he had a chance of a better medical outcome at the time of the professional negligence and that the tortfeasor’s action or inaction deprived him of all or part of that chance.
*138 In this particular case, the trial court found that plaintiff proved by a preponderance of the evidence that Dr. Angelica breached the applicable standard of care by not calling for an emergency cardiology consultation at 2:50 a.m., thus disagreeing with the medical review panel’s finding, but that plaintiff failed to prove a causal connection between Dr. Angelica’s negligence and plaintiffs resulting damages. Appellees did not appeal the trial court’s finding relative to Dr. Angelica’s negligence. Accordingly, the only matter before this Court is whether the trial court erred in finding that plaintiff failed to prove a causal connection between Dr. Angelica’s negligence and plaintiffs resulting damages, and whether such negligence deprived plaintiff of a chance of a better medical outcome. Plaintiff argues that the trial court held him to an impossible burden of proof: to prove, with certainty, after the fact, what the outcome would have been had Dr. Angelica not breached the standard of care.
Appellees contend, on the other hand, that the trial court did not err in applying the burden of proof plaintiff must meet in this case. Appellees state that 19the trial court did not require plaintiff to prove to a certainty that earlier intervention by a cardiologist would have prevented all or some of his heart muscle damage that occurred. They posit that plaintiffs theory of causation is based on the speculative testimony of his expert, Dr. Reitman, while appellees’ experts, Drs. Coco and McKin-nie, specifically testified that Dr. Angelica’s failure to call for an emergency cardiac consultation did not cause plaintiff to sustain any damages that he otherwise would not have sustained.
Plaintiff offered the testimony of Dr. Reitman, an expert in cardiology and an interventional cardiologist. Dr. Reitman testified that “time is muscle.” He felt that the rise in cardiac enzymes at 2:50 a.m., combined with the abnormal EKG and ongoing chest pains, pointed to acute coronary syndrome and a non-ST segment elevation M.I., which required Dr. Angelica to call a cardiologist at that time for immediate consultation and possible treatment. Dr. Reitman said, however, that the decision to bring a patient with signs of a non-ST segment elevated M.I. to the catheter lab would be made after knowing if the chest pains were ongoing or sporadic and after an examination of the patient. He agreed, though, that the rise in enzymes could indicate that heart muscle damage had probably already occurred or was occurring. Dr. Reitman said that it was impossible to know exactly when the artery closed definitely and for good. He could not say without speculation whether the results would have been different had plaintiff gotten to the catheter lab at 2:50 a.m., or at 3:00 a.m., or at 8:00 a.m.
Dr. Reitman read Dr. Tilton’s treatment notes and saw that he prescribed plaintiff aspirin and heparin, a blood thinner, in the morning, which to Dr. Reitman indicated that plaintiff had ongoing symptoms of pain. He could not account for the approximately seven-hour delay between Dr. Tilton’s first evaluation of plaintiff and when he took plaintiff to the catheter lab. He concluded that Dr. | inTiIton took a conservative approach and decided not to place a stent, in part because he was uncomfortable with the orientation of the blockage and that a stent might compromise the main artery, the left anterior descending. Dr. Reitman stated that some interventionists, however, would have tried to stent the artery.
Dr. Reitman testified that regardless of whether plaintiff would have undergone angioplasty, he would still have been prescribed the same group of medications that he was currently taking. He said that it *139 was also possible that plaintiff would experience occasional chest pain as well, even if he had angioplasty. He testified that as a result of his heart attack, plaintiff had a higher than normal chance of experiencing ventricular tachycardia, a potentially fatal abnormal heart rhythm, though in plaintiffs case, the risk was lower because he preserved an ejection factor[8] of 50 (normal being 55), which was good. He also said that plaintiff might suffer depression because of the realization he had coronary artery disease, though he agreed he had not met plaintiff and could not state whether he was depressed.[9]
Dr. Jeffery Coco testified as an expert in internal medicine for appellees. He reviewed the records in this case and testified that although he did not believe the standard of care required Dr. Angelica to call for an immediate cardiology consultation, based on the records, he would have done so had Mr. Pesses been his patient.
Dr. James McKinnie, a board certified cardiologist with expertise in heart rhythms, also testified for appellees. He reviewed all of the medical records and depositions in this case. Though he was not an interventionist cardiologist, he worked regularly with those doctors and saw the results of their work. He In disagreed with Dr. Reitmaris interpretation of plaintiffs first EKG of February 11, 2007 (which was done in the emergency room), explaining that EKGs are nonspecific for heart attacks. He opined, based on the rise in cardiac enzymes shown by the 2:50 a.m. lab panel, that the vessel had probably already occluded to cause the rise in enzymes, though he agreed it was impossible to tell within an hour-to-hour time frame when the vessel occluded. He also testified that the benefit of opening up an “infarct related artery” was well established for the major vessels, but not as well established for the branch vessels, the location of plaintiffs occlusion, because of the risk of doing greater damage (to a major vessel) for less benefit (the smaller area of heart muscle affected by an occlusion in a branch vessel). Dr. McKinnie also testified that regardless of whether plaintiffs artery had been opened with angioplasty or not, he would still be on the same “standard” drug regimen for post M.I. patients that he was currently on.
Dr. McKinnie testified that it was impossible to know whether the heart muscle damage occurred by 1:36 a.m., when the cardiac enzymes were drawn. He noted that plaintiff initially presented with pain that he felt was GI related and that the emergency room doctors focused on that presentation, taking about four hours to complete that workup. The first enzyme panel was not drawn until late, after the GI work, although plaintiff experienced chest pains for hours at that point. He also testified that enzymes can continue to rise after an infarct, and that the chest pain can continue for up to as much as 48 hours after an infarct. Dr. McKinnie said that the infarct usually occurs sometime between the onset of chest pains and the peak of the enzyme levels. He could not testify with any certainty as to whether the vessel was occluded at 2:50 a.m.
Looking at the record as a whole and the trial court’s ruling, we disagree with plaintiffs contention that the trial court in this case held him to a burden of 1 12proof more stringent than a preponderance of the evidence. However, it appears that *140 the trial court misunderstood the nature of plaintiffs cause of action. The trial court found, in its reasons for judgment, that “no expert testified that if Mr. Pesses had been examined by a cardiologist at 2:50 a.m., then he would not have suffered the heart muscle damage.” And as noted above, the court further found that “the claim for a lost chance of saving Mr. Pess-es’ heart muscle is highly speculative, and not supported by the testimony presented at trial.” After review of the applicable jurisprudence, however, the trial court apparently failed to understand that the focus here is whether .the doctor’s action or inaction deprived plaintiff of a chance to have a better medical outcome, not whether a better outcome would have, in fact, occurred. Thus, we find that the trial court’s conclusion that plaintiff failed to bear his burden of proof in this case was manifestly erroneous. The medical testimony in this case was clear that time is of the essence in treating a blockage in a coronary artery. The sooner the patient is evaluated, the sooner active treatment can be started, and the better the chance to intervene in time to open the blocked artery and reverse or minimize the heart muscle death. The doctors were all in agreement that the elevated enzymes at 2:50 a.m. were the earliest laboratory confirmation that plaintiff had, in fact, experienced a heart attack, or was, in fact, experiencing a heart attack.[10] Their testimony differs only in that they did not agree whether these lab results indicated if the heart attack was still in progress at that time, when intervention was possible, and when the artery could no longer be stent-ed.
Because it was clearly shown that time is of the essence in treating cardiac arterial blockages, we find that plaintiff proved by a preponderance of the evidence [ iathat Dr. Angelica’s failure to call for a cardiac consultation at 2:50 a.m. deprived plaintiff of the opportunity to have a specialist (a cardiologist) with specific expertise evaluate his case at 2:50 a.m., or very soon thereafter, and exercise his expert judgment regarding whether angioplasty (or other intervention) was an option at that time. Because of Dr. Angelica’s negligence, plaintiff was not evaluated until hours later by Dr. Tilton, after his chest pain essentially had resolved. In other words, we find that plaintiff proved by.a preponderance of the evidence that he had a chance of a better medical outcome at the time of the professional negligence, and that Dr. Angelica’s negligence (inaction) deprived him of that chance. Accordingly, we reverse the trial court’s judgment finding that plaintiff failed to bear his burden of proof that Dr. Angelica’s negligence deprived him of a chance of a better medical outcome.

HEARSAY EVIDENCE

Plaintiff also argues that the trial court erred in sustaining defense counsel’s objection to his attempt to testify regarding statements allegedly made by Dr. Til-ton to plaintiff on the morning of February 12, 2007, following Dr. Tilton’s review of plaintiffs chart and test results from the night before. Appellees objected on the grounds of hearsay, noting that Dr. Tilton was never deposed nor called as a witness in this case and was not shown to be unavailable. The objection was sustained, *141 and plaintiff proffered his testimony for the record.
Plaintiff argues on appeal that he should have been allowed to testify regarding what Dr. Tilton allegedly said to him. Plaintiff argues that appellees “opened the door” to this otherwise hearsay testimony when appellees cross-examined plaintiff about conversations plaintiff had with his doctors. Plaintiff claims that this testimony is critical to his case because he claims Dr. Tilton stated |14that he could have saved plaintiffs heart muscle if he had been called to consult earlier.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). Hearsay is not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802. Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter, who is not subject to cross-examination and other safeguards of reliability. State v. Smothers, 05-781 (La.App. 5 Cir. 3/28/06), 927 So.2d 484.
It is clear that plaintiff sought to introduce these hearsay statements of Dr. Til-ton to prove the truth of the matter asserted: that plaintiff’s heart muscle damage could have been prevented or minimized if the cardiology consultation had been called earlier. Accordingly, given this assertion and the fact that plaintiff has not shown that Dr. Tilton was unavailable to testify, the hearsay statements sought to be introduced through plaintiffs testimony were properly excluded.
Further, as appellees point' out in brief, the defense’s questioning of plaintiff regarding particular conversations he had with other doctors did not open the door to the introduction of these statements allegedly made to plaintiff by Dr. Tilton. Defense counsel questioned plaintiff regarding specific notes documented within his treating physician’s records. In several instances, as noted in appellees’ brief and confirmed in the record, plaintiff was asked on cross whether the doctor did in fact inform him of various test results or recommendations that the doctor had documented in plaintiffs record as having shared with plaintiff. These questions regarding whether plaintiff was informed by his doctor, as the doctor claimed in the duly admitted medical records, does not open the door to the hearsay 11fistatements plaintiff sought to introduce and preserve in his proffer. Accordingly, this assignment of error is without merit.

DAMAGES

Having found that plaintiff proved that he was deprived of a chance of a better outcome by Dr. Angelica’s negligence, we shall award plaintiff damages on the record before us.[11]
As noted above, the method of valuation of loss of a chance of a better outcome is for the factfinder, judge or jury, to focus on the chance of a better outcome lost on account of malpractice as a distinct injury compensable as general damages which cannot be calculated with mathematical certainty, and the factfinder should make a subjective determination of the value of that loss, fixing the amount of money that would adequately compensate the claimant for that particular cognizable loss. Smith v. Department of Health & *142 Hosps., supra, at 548. The loss of a chance of a better outcome in professional malpractice cases has a value in and of itself. Id. We are thus required to value the loss of a chance of a better outcome as a lump-sum award based on all the evidence in the record, as is done for any other item of general damages. See also Hargroder v. Unkel, supra, at 958, citing Graham v. Willis-Knighton Medical Center, 97-0188 (La.9/9/97), 699 So.2d 365.
Following his discharge from EJGH, plaintiff underwent five echocardiograms to assess his heart function. These tests were performed on June 21, 2007, February 25, 2008, July 2, 2008, September 1, 2010, and January 28, 2011, all of which revealed evidence of essentially normal heart function.
| ^Plaintiff was the only witness who testified about his recovery, physical condition, and limitations. He testified that he underwent cardiac rehabilitation, which was initially made difficult by the side effects of one of his post-heart attack medications. When that medication was changed, he noted that his symptoms were much improved. Plaintiff testified that he now .takes a beta blocker for blood pressure, statins for cholesterol, and aspirin, as well as other medication as needed. He testified that he cannot walk great distances without chest pains and shortness of breath, and that he sold his two-story house to move to a one-story house because he gets winded on stairs.[12] He testified that when he and his wife travel on trips and cruises, she must carry the luggage, and that she does more of the heavy housework, which causes him to feel that he is not an equal partner in their marriage.[13]
Plaintiff notes in brief that he stipulated that his damages did not exceed $50,000.00. He encourages this Court to award him the full amount on his assertion that his damages far exceed this amount. However, the scant evidence of damages adduced at trial shows that plaintiff did, in fact, make a very good recovery, as reflected by his post-MI echocardiogram results that show essentially' normal heart function. While plaintiff testified that he suffers periodic chest pain on exertion, the medical experts, including plaintiffs expert Dr. Reitman, testified that plaintiff might experience this even if he underwent timely angioplasty. Further, according to the expert testimony, plaintiff is on the same prescription drug regimen that he would have been on had he undergone angioplasty. There was no showing that plaintiff would not have participated in cardiac rehabilitation had he had angioplasty.
117The experts in this case were not able to establish at what point in time angioplasty ■ would have been unavailable to plaintiff. While one expert felt that the vessel was still susceptible to a stent had Dr. Angelica called for a cardiologist consultation at 3:00 a.m., another expert felt that the same medical evidence indicated that the heart attack concluded by that time. Furthér, all experts expressed concern that the location of the obstruction in the diagonal vessel would be difficult to stent due to the high possibility of cáusing major damage to a larger vessel, the left anterior descending artery, which is located nearby.
Given the various and somewhat contradictory expert opinions adduced at trial, it cannot be said that Dr. Angelica’s negligence caused plaintiff to lose a 100 percent chance of a better medical recovery. Upon review, we find that the record supports a finding that plaintiff had a less-than-even chance of a better recovery had *143 Dr. Angelica called for a cardiac consultation at 2:50 a.m. See, e.g., Graham v. Willis-Knighton Medical Center, 699 So.2d at 373 (a 20-33% chance of saving plaintiffs leg was lost by failure to perform surgery timely).
The cited cases on the “loss of chance” cause of action provide little guidance to this Court in fashioning a damage award in the absence of more specific evidence. Upon review, we find that the evidence taken as a whole (the medical evidence, expert testimony, plus plaintiffs own self-serving testimony) supports an award of $12,000.00 to compensate plaintiff for his less-than-even chance of a better medical outcome.

CONCLUSION

Accordingly, for the foregoing reasons, we reverse the trial court’s judgment under review and hereby render judgment in favor of plaintiff and against defendants for the sum of $12,000.00 in damages for plaintiffs loss of a chance of |isa better medical outcome. Costs of this appeal are assessed to defendants/appellees.

REVERSED AND RENDERED

. Plaintiffs emergency room record shows that he reported a history of esophageal problems.

. The record reflects that a "GI cocktail” is a mixture of Maalox, Lidocaine and several other things.

. Plaintiff was considered "unreferred” because his internist did not have hospital privileges at EJGH.

. The nurse's notes on plaintiff's chart report "mild chest pain” and pain on a scale of 5 out of 10, 10 being the maximum. The record also reveals that late that evening (around 11:00 p.m.), Dr. Angelica ordered morphine for pain, which he testified he would not have done for merely "mild” pain.

. An angiogram is an X-ray test that uses a special dye and camera to take pictures of the blood flow in certain blood vessels, in this case the coronary arteries.

. The expert witnesses in this case, all physicians, testified that the purpose of a stent in a coronary artery is to restore blood flow to the heart muscle in order to prevent or minimize muscle death or damage.

. Besides Dr. Angelica, plaintiff also named Dr. Hauth and his medical malpractice liability insurer (also LAMMICO) as defendants in his petition for damages. On October 7, 2010, the district court granted plaintiff's motion and order voluntarily dismissing Dr. Hauth from the action. Thus, plaintiff proceeded to trial only against Dr. Angelica and LAMMICO.

. “Ejection factor” is a measurement of the percentage of blood leaving the heart each time it contracts.

. Dr. Reitman agreed that plaintiff suffered from pre-existing coronary artery disease that could not be attributed to Dr. Angelica's negligence.

. Testimony from the expert doctors in this case was in relative agreement that the chest pains, without other indicators, could have signified a GI event, which was the conclusion reached by the emergency room physician initially, and that the elevation of only two cardiac enzymes, as indicated in the previous lab reports, was not necessarily indicative of a heart attack at that time.

. When the record is complete, the court of appeal is empowered, under La. C.C.P. art. 2164, to award damages. BellSouth Tele-corns., Inc. v. Bennett Motor Express, LLC, 13-438 (La.App. 5 Cir. 12/12/13), 131 So.3d 236, 238.

. Plaintiffs medical records note that he may have weight management issues.

. It is noted that plaintiff did not claim that he is unable to travel or enjoy these vacations.