BLEICH, J. (Pro Tempore)
11 Carol and Roger Burchfield appeal a judgment by the First-Judicial District *1172 Court, Parish of Caddo, State of Louisiana, in their favor and against the Patient’s Compensation Fund in the amount of $ 400,000.00. The Patient’s Compensation Fund (“PCF”) answers the appeal, seeking a reduction in the judgment’s award. For the following reasons, we affirm the judgment of the trial court, as amended, and render judgment in favor of Carol and Roger Burchfield.
Facts
On August 14, 2013, after referral by his gastroenterologist, Roger Burchfield was admitted to Willis-Knighton Medical Center (“Willis-Knighton”) for gallbladder surgery to be performed by Forrest Wright, M.D. Pursuant to Dr. Wright’s pre-operative orders, Roger arrived at the hospital and underwent a chest X-ray and EKG the morning of the surgery. Roger’s EKG was not read by Dr. Wright prior to surgery. The previously ordered EKG indicated: 1) possible left atrial enlargement; 2) nonspecific intraventricular block; 3) possible septal infarct; and 4) inferior infarct. The chest x-ray, which, again, was not read by Dr. Wright, the anesthesiologist, or hospital nursing staff prior to Roger’s surgery, showed congestive heart failure. Roger was unaware of any of these conditions.
With the EKG and chest X-ray having gone unread by Dr. Wright, and despite the findings from the tests, Roger was placed under general anesthesia, and the surgery proceeded. There were no apparent immediate complications, and he was discharged later that day.
After almost 32 hours (on August 16), Roger presented at an emergency room near his residence with shortness of breath and significant ^swelling. He was determined to be in critical condition and was transported via ambulance to Willis-Knighton where he was admitted to the intensive care unit. Later, it was concluded that Roger had suffered an acute myocardial infarction (i.e., a heart attack) and respiratory failure, as well as worsening of pulmonary edema, congestive heart failure, and bilateral pleural effusions. Roger was intubated and placed in a medically induced coma. A heart catheterization was performed, by which an intra-aortic balloon pump was inserted to assist the pumping of his heart. Roger was also placed on a ventilator to assist his breathing.
Apparently, because the damage to Roger’s heart was too great, the medical team determined Roger was not a candidate for heart bypass surgery, and he had to be transported to Baylor Medical Center in Dallas, Texas, on August 22, 2013. There, he was evaluated for a left ventricular assist device and/or a heart transplant. On September 3, 2013, Roger received a new heart.
It appears from the record that Roger has had a generally satisfactory recovery from the transplant (however “satisfactory” a recovery can be with a transplanted organ). Nonetheless, he is disabled from his previous lifelong profession as a heavy equipment mechanic, and as a heart transplant patient, he is now laboring under strict medical treatment for the remainder of his life. The life expectancy for heart transplant patients is 13 years; thus Roger, who was 58 years old at the time of this incident, is expected to have, statistically, a much shortened lifespan.
The Burchfields’ case was brought before the Medical Review Panel (“MRP”), which concluded that Dr. Wright had breached the standard of care by failing to review the pre-op tests he had ordered. According to the |sMRP’s opinion, Roger’s gallbladder surgery was not an emergency. Further, the MRP opined the chest X-ray report “warranted postponing the surgery until a cardiology consult could be obtained ... the failure to review the chest x-ray *1173 report and request a cardiology consult was a factor of the resultant damages.” (Emphasis added).
The Burchfields filed a medical malpractice claim against the health care providers involved vsith Roger’s surgery. Two of the defendants ultimately were dismissed, and the claim against Dr. Wright eventually was settled for $ 100,000.00. After a three-day jury trial against the PCF, the jury determined there were no damages caused by the breach of the standard of care, but concluded that Dr. Wright’s breach of the standard of care caused Roger a lost chance of a better outcome. The jury awarded Roger a lump sum of $ 680,000.00 in damages for his lost chance, but it did not indicate if those damages were general or special.
The trial court, recognizing the medical malpractice statutory cap of $ 500,000.00, reduced the jury verdict from $ 680,000.00 to $ 400,000.00 and rendered its judgment.[1] The Burchfields filed a motion for judgment notwithstanding the verdict, which was denied. This appeal by the Burchfields ensued, and the PCF answered the appeal seeking a further reduction in the award.
Discussion
On appeal, the Burchfields raise several assignments of error, but they primarily take issue with the jury verdict form and interrogatories contained |4therein.[2] Most problematic in this case is the reduction in the jury award by the trial judge, which is addressed in the last of the Burchfield’s assignments. "Whereas we agree with the jury’s ultimate finding that Roger did indeed suffer a lost chance of a better outcome as a result of Dr. Wright’s breach of the standard of care, we believe the jury’s responses to the interrogatories are internally inconsistent, contributing to the troublesome reduction by the trial judge of the jury’s award.
The Burchfields argue that the trial court erred in concluding that a lost chance of a better outcome could consist only of general damages, thereby reducing the jury verdict from $ 680,000.00 to $ 400,000.00. We agree, primarily because we find the answers to interrogatory numbers one and six on the jury verdict form to be patently inconsistent, leading to an inability of the jury to consider all of the damages suffered by the Burchfields as a result of Roger’s heart transplant. The verdict form is attached as Exhibit “A.”
"When faced with a legal error that has tainted a jury verdict, the general rule is that where the record is “otherwise complete, the appellate court should make its own independent de novo review of the record to determine a preponderance of the evidence.” Evans v. Lungrin, 1997-0541 (La. 02/06/98), 708 So.2d 731, 735; see also, Lam v. State Farm Mut. Auto. Ins. Co., 2005-1139 (La. 11/29/06), 946 So.2d 133, 135. The trial court’s submission to the jury of “a verdict sheet which either confuses or misleads the jury” constitutes reversible legal error that triggers de novo review. Oddo v. Asbestos Corp. Ltd., 2014-0004 (La. App. 4 Cir. 08/20/15), 173 So.3d 1192, 1205, writ denied, 2015-1712 (La. 11/06/15), 180 So.3d 308.
In the case before us, because we have a complete record on appeal, and due to the jury’s reaching clearly inconsistent answers in its verdict form, we find de novo review to be the appropriate remedy. Applying de novo review, the appellate *1174 court independently views the record, without granting any deference to the trial court’s findings, to determine the preponderance of the evidence. Banks v. Children’s Hosp., 2013-1481 (La. App. 4 Cir. 12/17/14), 156 So.3d 1263, 1272. Where, however, the legal error does not affect all the jury’s findings, the appellate court should confine its de novo review to only those findings that have been interdicted by the error. Id. at 1272.
Here, the dialogue at the bench reflects the difficulties encountered during trial when considering the proposed jury charge and verdict form, and it is unclear if there was sufficient objection to, or argument for, any proposed jury interrogatory. Nor is the trial court’s ruling sufficiently precise, as we note from a portion of the following bench conference, which pertained to the jury interrogatories regarding the damages: ■ ■
MR. SOILEAU: So [the jury] could award some damages, not all, and award some lost chance damages or they could award all damages and no lost chance.
[[Image here]]
MR. KING: Nobody, said you can do that. It’s your claim the damages are what- the damages are. But it’s per claim, not- per damage aspect that the Court.said you can go back and forth. Too much jury confusion there, or possibility for it. ...
THE COURT: I see both arguments on that. And it’s interesting, I haven’t seen anything on that ....
I mean, a lot of it overlaps, and that’s the problem ....
IfiLook, this is a tough one for the jury. It’s not a cut and dry deal. It’s a tough one for the jury to figure out .... Here’s my problem. I can only lead a horse to water, man, you know. I would think—and'- we got 12 people, and they’re reading this and they’re figuring it out, they can do it. I’m sure as heck hoping. If not, we got problems.
Trial transcript, Record pp. 826-9. (Emphasis added).
Whether the interrogatories were correctly used, either from a substantive or procedural standpoint, is, however, of no moment in light of our precise finding. The only justifiable conclusion that this court can render is patently clear, especially since the jury’s error was left insufficiently corrected via post trial motion. This fact remains—the answers to jury interrogatory numbers one and six, the only interrogatories answered, are conflicting and cannot form the basis for any proper result.
Notably, in this case, the legal error in the verdict form did not affect all .of the jury’s findings, i.e., the jury’s determination whether Roger suffered a lost chance of a betteroutcome—the record clearly supports that. ■
The problem lies with the.determination of the monetary amount of damages for that lost chance—the jury was not given adequate instructions on the verdict form (or instructions in the jury charge) on how to quantify the damages caused by the breach. At the argument on the Burch-fields’ motion for JNOV, the trial judge acknowledged not knowing precisely what the jury’s intént was regarding the amount of damages. Considering the record and all of the evidence before the jury, the uncertainty is understandable. Was the jury’s award of $ 680,000.00 an attempt to compensate the Burchfields for Roger’s past medicals, which he incurred |7because Dr. Wright’s actions caused his lost chance of a better outcome?[3] Was any portion of the award to compensate Roger for his lost wages or the emotional distress caused by the heart transplant? Or, was any portion *1175 of the “lump sum” intended to compensate Carol for her loss of consortium claim? In this particular case, there is no way of knowing the precise answers to these questions based on the record before us; thus we conclude that the verdict form was flawed as a matter of law, leading to the confusing lump sum awarded by the jury and eventually modified by the trial judge.
In calculating damages for a lost chance claim, the factfinder is to focus on the chance lost on account of the malpractice as a distinct compensable injury and to value the lost chance as a lump sum award on all the evidence in the record, as is done for any other item of general damages. Hargroder v. Unkel, 39,009 (La. App. 2 Cir. 10/29/04), 888 So.2d 953, 957, writ denied, 2004-2908, 2004-2909 (La. 02/04/05), 893 So.2d 874, citing Smith v. State, Dept. of Health & Hosps., 1995-0038 (La. 06/25/96), 676 So.2d 543. In order to value the claim of loss of a chance of a better outcome, the factfinder should make a subjective determination of the value of that loss, fixing the amount of money that would adequately compensate the claimant for that particular cognizable loss. Smith v. Department of Health & Hosps., supra at 548 (emphasis added).
The parties concede that there is no jurisprudence precisely on the point at issue in this case; however, in calculating an award for lost chance of a better outcome, a jury may consider what otherwise would be elements of special damages (for instance, lost wages and past, present, and future 18medical expenses). See, Bianchi v. Kufoy, 2010-607 (La. App. 3 Cir. 12/08/10), 53 So.3d 530. Moreover, an award for lost chance encompasses a “lump” of damages—a “lump” connoting a number of items taken together—that otherwise would have been delineated in damages for malpractice. Thus, logically, it follows if that is the case (i.e., damages for lost chance are a “lump”), then such an award may include special damages to adequately compensate a patient, and that “lump sum” damages should not be limited to the cap for general damages established by the : Medical Malpractice Act.
In Bianchi, supra, the trial court had determined the physician had breached the standard of care, but concluded Bianchi failed to prove causation. On appeal, the Third Circuit concluded that Bianchi had proved the physician’s breach caused Bian-chi a lost chance of a better outcome. Of significance to the case sub judice was the Third Circuit’s award to Bianchi and his wife to “adequately compensate the plaintiffs for their general and special damages.” Id. at 536 (Emphasis added).
Here, in reducing the jury’s verdict award, the trial court reasoned that the lost chance damages were simply general in nature and subject to the medical malpractice cap ($ 400,000.00 after deducting the settlement amount), thus precluding the Burchfields from awards for -Roger’s past medical bills, his future medical care, and lost wages. This determination was in error. But for Dr. Wright’s breach of the standard of care, Roger would not have experienced the damage he did—a resultant heart transplant. Excluding the sole expert retained by the PCF, all of the medical expert evidence was clear and consistent: more probably than not, Roger would Rhave received a heart bypass instead of a heart transplant had Dr. Wright not failed to review the very pre-operative tests he ordered.
The jury’s factual finding on Roger’s lost chance was supported by the testimony of Dr. Dean Griffen, a member of the MRP and a surgeon. At trial, he reiterated the panel’s finding that Dr. Wright had caused the damage to Roger, and Roger would have most probably been a candidate for bypass surgery. Notably, Roger’s stable condition prior to the gallbladder surgery *1176 made him a stronger candidate for the bypass surgery. Dr. Griffin characterized Dr. Wright’s omission and the surgery as “the straw that broke the camel’s back.”
Dr. Shelley Hall also agreed that Roger suffered a lost chance of a better outcome. Dr. Hall was chief of Baylor’s cardiac transplant team that worked on Roger. She believed Roger would have been a candidate for bypass surgery had the pre-op tests been reviewed, and Dr. Hall specifically stated she believed his blockages could have been bypassed. Notably, as a transplant doctor, Dr. Hall testified to Roger’s prognosis as a transplant patient, explaining that heart transplant patients have an average survival rate of 13 years and suffer complications and risks as a result of the required immunosuppressant medications prescribed. According to Dr. Hall, such patients are subject to higher risk for other diseases, such as skin cancer, kidney disease, and diabetes—necessitating even further medical attention.
Other physicians who treated Roger, Dr. Richard Morrison (a pulmonologist) and Dr. Ray Smith (a cardiologist), agreed that had Dr. Wright reviewed the pre-op tests and postponed the gallbladder surgery, Roger would have had a better outcome. Finally, Dr. Brijesh Patel, a cardiologist (but not one of Roger’s treating physicians), reviewed Roger’s [10record and opined that Roger would have been a candidate for heart bypass, which would have been a better outcome than a heart transplant.
This record is replete with evidence regarding the damages caused to Roger and Carol as a direct result of Dr. Wright’s breach of the standard of care which contributed to Roger’s lost chance. It is completely illogical to conclude that the Burch-fields were indeed damaged by Dr. Wright’s actions, but then not completely compensate them for their damages proved at trial directly attributable to the lost chance.
The jury was presented testimony regarding Roger’s past medical bills that were a result of his heart transplant, which totaled $ 692,850.64. This was uncontested. The jury also heard Roger’s testimony regarding the medications he is required to take as a result of his transplant— $ 1,718.78 in monthly expenses. Of those medications, the ones directly related to his transplant (anti-rejection medication) total $ 1,202.77 a month. In addition to the distinct monetary expense of Roger’s medications, the jury also had evidence of the substantive future medical protocol necessary for heart transplant recipients—Roger will be subject to medical treatment and resulting expenses for the rest of his life as a result of the lesser outcome. See La. R.S. 40:1231.3.
The jury also heard testimony regarding Roger’s future wages. In 2012, the year prior to the transplant, Roger had reported wages from International Paper of $ 82,170.00, as evidenced by his 2012 federal income tax return. Roger testified he was unable to return to his same job due to its strenuous nature, and he also explained his plan to retire in the year 2020. Using his reported wages from 2012 along with his testimony regarding his hi plan to continue working through 2019, we determine Roger had lost wages from 2014 through 2019, for a total of $ 493,020.00.[4]
Finally, we affirm that portion of the trial court’s judgment that awarded “general damages” in the amount of $ 400,-000.00 to Roger and Carol. The amounts obtainable and awarded subject to the cap for the past and future physical and emotional damages of the parties are profound. *1177 Even on the “cold record,” it is evident that Roger was traumatized, physically and emotionally, over this incident. Roger went to the hospital for a fairly routine procedure, trusting that the physician would adhere to even the minimal standard of care. However, within hours, his life was changed forever. Roger entered the hospital as a vital, music-loving, motorcycle-riding, hard-working man—immensely proud of his work history. He left Baylor’s heart unit a heart transplant recipient with a permanent cloud of future medical treatment forever to follow him. Roger and Carol had a planned date of earned retirement, a reward for years of hard work and wise financial stewardship. But this date was accelerated due to another’s mistake. Roger’s way of life, as he had known it, and his anticipated future life has been taken away. Further, the loss of consortium sustained by both is virtually indescribable.
In this case, the breach of the standard of care cost Roger his heart, and certainly he was not granted any favors by Dr. Wright’s malpractice.[5]112Instead, the malpractice was the direct cause of his lost chance of a better outcome, and, therefore, he deserves just compensation in the form of general and special damages.
Conclusion
For the foregoing reasons, we affirm the trial court’s judgment in favor of Carol and Roger Burchfield, as it pertains to the determination that Dr. Forrest Wright’s breach of the standard of care caused Roger Burchfield the loss of a better outcome. We amend the amount of damages awarded by the trial judge to award $ 400,000.00 in general damages, including past and future pain and suffering, as well as Carol’s loss of consortium. Further, we award special damages for the following: $ 692,-850.64 in past medical bills; future medicals to be-awarded pursuant to La. R.S. 40:1231.3; and, lost wages in the amount of $ 493,020.00, all of which have been indisputably proven. All costs of this appeal are to be paid by the Patient’s Compensation Fund.[6]
AFFIRMED, AS AMENDED, AND RENDERED.
Exhibit “A”
*1178 [[Image here]]
*1179 [[Image here]]
APPLICATION FOR REHEARING
Before WILLIAMS, MOORE, STONE, COX and BLEICH, JJ.
Rehearing denied.
MOORE, J., would grant rehearing.

. The amount reflected the $ 100,000.00 settlement paid by Dr. Wright.

. In their first assignment of error, the Burch-fields argue the trial court erred in not using the Louisiana Supreme Court’s suggested jury charges. We take notice of that claim, and without determining the trial court’s action was in error, we believe the action was harmless in this case.

. Cf. the amount awarded herein, infra, in the amount of $ 692,850.64.

. Although there was argument by the PCF that Roger could potentially perform some other form of work, there was no direct evidence of such work or the amount he would earn to mitigate his total lost wages.

. Notably, this court vehemently disagrees that Dr. Wright's malpractice somehow amounted to a favor to Roger. Dr. Wright certainly did not save Roger’s life by failing to read the very pre-operative reports he ordered, a breach of the standard of care directly causing Roger’s lost chance of a better outcome.

. The assignment of error raised by the PCF in its answer to appeal is pretermitted in light of our conclusion herein.